[No. S050142. July 26, 2004.]

In re LARRY DOUGLAS LUCAS, On Habeas Corpus.

684

COUNSEL

Cooley Godward Castro Huddleston & Tatum, Cooley Godward, Paul A. Renne, Steven L. Friedlander, Eric R. Fleming, Robert M. Galvan, Noel C. Johnson, Tracy S. Kaplan, Jeffrey T. Lindgren, Julie C. Lythcott-Haims, Charles M. Schaible, David E. Garrett, Sarah L. Kowalski and Whitty Somvichian for Petitioner Larry Douglas Lucas.

Daniel E. Lungren and Bill Lockyer, Attorneys General, George Williamson, David P. Druliner and Robert R. Anderson, Chief Assistant Attorneys General, Carol Wendelin Pollack and Pamela C. Hamanaka, Assistant Attorneys General, Kenneth C. Byrne, Robert S. Henry, Susan Lee Frierson, John R. Gorey and Mary E. Sanchez, Deputy Attorneys General, for Respondent State of California.

OPINION

**GEORGE, C. J.**—In *People v. Lucas* (1995) 12 Cal.4th 415 [48 Cal.Rptr.2d 525, 907 P.2d 373], we affirmed the judgment against petitioner Larry Douglas Lucas, who is confined in state prison under sentence of death for the murders of an elderly couple who resided next door to him. The prosecution's evidence was that petitioner entered the couple's home with the intent to commit a burglary and that he killed the victims when they discovered him in the course of the burglary. Petitioner's primary defense was that he killed the victims while in a drug-induced state of unconsciousness.

Petitioner filed a timely petition for writ of habeas corpus seeking relief on various grounds, and this court issued an order to show cause on issues

limited to claims of asserted ineffective assistance of counsel at the penalty phase of the trial and asserted juror misconduct during deliberations at the guilt phase. We subsequently appointed a referee to conduct an evidentiary hearing and to make findings upon questions relating to these claims. After the evidentiary hearing, the referee determined that there was a factual basis for petitioner's claims with respect to asserted deficiencies of counsel at the penalty phase of trial and with respect to asserted misconduct by a juror at the guilt phase.

With respect to the claim of juror misconduct at the guilt phase, we conclude that the juror statements upon which petitioner based his claim simply reflected the juror's background and experiences. Further, even if the statements might be characterized as misconduct, they did not result in prejudice to petitioner.

With respect to the claim of ineffective assistance of counsel at the penalty phase, however, we conclude that petitioner's trial counsel failed to conduct an adequate investigation in preparation for the penalty phase of the trial. Evidence readily could have been discovered that would have demonstrated the severe emotional and physical abuse suffered by petitioner as a pre-schooler and young child. In addition, there was readily discoverable evidence establishing that, beginning at the age of seven years, petitioner was housed in an institution for abused and neglected children that was staffed by abusive, violent adults, and that subsequently he was placed in juvenile correctional facilities that were known for crowding, neglect, and abuse. Trial counsel's limited investigation was not consistent with prevailing professional standards at the time of trial and, in abandoning their investigation, counsel unreasonably failed to recognize indications that inquiry into petitioner's social history would disclose substantial mitigating evidence. Counsel lacked a sufficient basis upon which to make a reasoned strategic decision to forgo further investigation or for their decision not to present any evidence at the penalty phase of trial.

The available mitigating evidence was weighty. Petitioner's sister, several cousins who lived with him when he was young, an aunt, and a woman who had been married to petitioner's cousin in her youth testified consistently concerning the brutal treatment meted out to petitioner by his mother, his stepfather, and his stepfather's mother. Treatment records that were prepared when petitioner was seven years of age by doctors employed by the county child protective service agency confirm that contemporaneous medical opinion was that petitioner had been the victim of cruel abuse.

Defense counsel did not present any evidence in mitigation at the penalty phase. The jury was not afforded any insight into what may have produced petitioner's capacity for violence or his drug dependency, nor any basis for exercising compassion. The jury found itself faced only with evidence of petitioner's ruthlessness and violence. Had defense counsel conducted an adequate investigation, readily available evidence might have been introduced that would have made the jury aware of petitioner's childhood experience of rejection and extraordinary abuse at the hands of his family. In turn, a reasonable probability exists that the jury would have found in this evidence some explanation for petitioner's criminal propensities and some basis for the exercise of mercy. Had it been made aware of this evidence, there is a reasonable probability the jury would have reached a different verdict—that "at least one juror would have struck a different balance." (*Wiggins v. Smith* (2003) 539 U.S. 510, 537 [156 L.Ed.2d 471, 123 S.Ct. 2527, 2543] (*Wiggins*).)

# I

## A

A jury convicted petitioner Larry Douglas Lucas of two counts of first degree murder (Pen. Code, § 187)[1] and burglary (§ 459), and found true the special circumstance allegations of multiple murder (§ 190.2, subd. (a)(3)) and burglary murder (§ 190.2, former subd. (a)(17)(vii), now § 190.2, subd. (a)(17)(G)). The jury imposed a sentence of death.

Petitioner was represented at trial by James E. Patterson, acting as lead counsel, and by cocounsel Richard A. LaPan. After a jury trial, petitioner was convicted of the October 1986 murders of Mary and Edwin Marriott, an elderly couple who were his neighbors. The following statement of facts is taken in large part from the description of the evidence at trial that appears in our decision in petitioner's automatic appeal. (*People v. Lucas, supra,* 12 Cal.4th at pp. 433–436.)

The bodies of the victims, Edwin and Mary Marriott, respectively 85 and 75 years of age, were discovered in their home. They had suffered multiple stab wounds and blunt force trauma. The house had been ransacked, and there were bloodstains throughout. Physical evidence suggested an intruder had broken the glass in the rear kitchen door and entered and exited through the kitchen door, which was secured with a deadbolt lock. Blood drops led from the kitchen to the driveway of petitioner's residence next door.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

Petitioner's fingerprints matched those retrieved from a jewelry box and another small box found inside the victims' home. A search of petitioner's home produced a pair of pants and boxer shorts with blood on them. The blood on the pants was consistent with petitioner's blood, while the blood on the boxer shorts found inside the jeans was consistent with Edwin Marriott's blood but not with petitioner's.

Petitioner testified he had resided next door to the Marriotts for many years. He said that on October 15, 1986, having received cash from his employer, he spent the day with two men, Gary Croffoot and Daniel Sandoval. He injected crystal methamphetamine, cocaine, and heroin in very large quantities. He passed out and could recall only standing in a dark hall, with faces like "waxy fright masks" coming at him. He tried to push them away and struck at them. He ran. He remembered driving, but could not recall where. He woke up at the beach and found that his hand was stuck with blood to the seat of the car. His right hand was cut across the knuckle of the index finger and on the palm, but he had no recollection of receiving these injuries. He continued to ingest drugs, returning home on one occasion to obtain money. He had no recollection of any "problem" with the Marriotts. He had no reason or desire to kill the Marriotts, and no need to enter their home to obtain money for drugs. He identified the pants found in his home as his, but was not certain the boxer shorts found inside them were his.

In rebuttal, police officers testified that after his arrest, petitioner admitted that a bloody knife found inside the house was his, and he attempted to hide his wounded hand during the interview with the police. In addition, the officers testified that, when asked how the window of the Marriotts' back door was broken, petitioner told them that he broke the window and removed the glass. According to the officers, petitioner admitted cutting himself inside the Marriott home, but did not admit killing the victims.

At the penalty phase of the trial, the prosecution offered evidence of petitioner's 1984 violent assault against an 18-year-old woman who often babysat for petitioner's young children. She testified that, when she approached petitioner about being paid for her work, he accused her of stealing his marijuana. When she denied having done so, petitioner seized the young woman by the hair and pointed a gun at her neck. He hit her in the face and knocked her off the porch where they had been standing. She went home and called for assistance from the police. Petitioner approached her again in front of her home and again demanded his marijuana. She denied having anything that belonged to him. He left but soon returned with his car, stating, according to her testimony, that he "was going to get someone to kill me." On cross-examination, she commented that she had not wanted to testify against petitioner at the penalty phase, particularly because she was a friend

of petitioner's wife, and that "it is all forgiven. It is in the past." Petitioner was convicted of assault with a deadly weapon for this offense.

Petitioner did not introduce any evidence at the penalty phase. The trial court asked that defense counsel state their reasons for the decision not to present evidence, and ordered an ex parte hearing for that purpose before Judge Robert W. Armstrong (hereafter, Armstrong hearing). At the hearing, as will be explained, petitioner's lead counsel, Patterson, recorded his reasons for failing to present mitigating evidence.

The trial court confirmed that Judge Armstrong had determined that petitioner's counsel had consulted 12 or 13 witnesses and had put forth a tactical reason for not calling witnesses at the penalty phase. The trial court also obtained petitioner's personal, on-the-record waiver of his right to testify at the penalty phase, as well as petitioner's statement that he concurred in counsel's decision not to present evidence at that phase of the trial.

Patterson presented closing argument on petitioner's behalf, stressing the evidence that indicated his behavior had been influenced by gross intoxication from drugs, and arguing that, although the jury had determined that petitioner had formed the requisite criminal intent sufficient to support the guilt verdicts, the evidence that petitioner was intoxicated and had committed the crimes out of a craving for drugs nonetheless could form a basis for a penalty less than death. Patterson urged that the evidence described a person who had acted in a frenzy, and who, while not legally insane, had not acted in his "right mind."

The jury returned a verdict of death.

## B

Petitioner's timely petition for writ of habeas corpus alleged, among other claims, that prejudicial juror misconduct occurred during jury deliberations at the guilt phase of the trial, in that one juror had stated he had experience with the type of drugs that petitioner asserted he had taken, but that these drugs did not produce the effect on the juror that was claimed by petitioner. Petitioner also claimed that his appointed counsel provided ineffective assistance, specifically alleging that the investigation pursued by counsel was inadequate. Further, petitioner claimed, a reasonable investigation would have produced ample evidence that he had suffered severe abuse and neglect as a child and that he had been confined in grossly inadequate juvenile facilities

for abused and neglected children starting at an early age. He alleged that other available evidence would have demonstrated that he possessed many positive characteristics but that his behavior had deteriorated in the months preceding commission of the crimes as a result of his increasing drug abuse. This court issued an order to show cause limited to the claims of juror misconduct at the guilt phase and ineffective assistance of counsel at the penalty phase of the trial.

Respondent Attorney General filed a return to the order to show cause, and petitioner filed a traverse.

We appointed Patrick Couwenberg, formerly a judge of the Los Angeles County Superior Court, to serve as referee and conduct an evidentiary hearing. We requested that he take evidence and make findings on the following four questions:

"1. What actions did petitioner's trial attorneys James E. Patterson and Richard A. LaPan take to investigate potential evidence in mitigation for the purpose of the penalty phase of trial? What were the results of the investigation? Was that investigation conducted in a manner to be expected of reasonably competent attorneys acting as diligent advocates? If not, in what respects was it inadequate?

"2. If trial counsel's investigation was inadequate, what additional information would an adequate investigation have disclosed?

"3. After conducting an adequate investigation of the circumstances in mitigation of penalty, would reasonably competent attorneys acting as diligent advocates have introduced evidence in mitigation at the penalty phase of trial? What rebuttal evidence reasonably would have been available to the prosecution?

"4. During guilt phase deliberations, what did [J]uror K[.] say with respect to his own drug use and his resulting opinion regarding petitioner's defense, and under what circumstances and in whose hearing did he make any such statement?"

The referee conducted an evidentiary hearing at which 18 witnesses testified. The referee admitted into evidence a large volume of documentary evidence relating to petitioner's trial, his childhood, and his institutionalization as an abandoned and neglected child. The referee also received into

evidence the deposition testimony of 13 additional witnesses. The referee's conclusions supported petitioner's allegations in most respects.

The principles governing our decision have been stated many times. As we recently declared: " 'A habeas corpus petitioner bears the burden of establishing that the judgment under which he or she is restrained is invalid. [Citation.] To do so, he or she must prove, by a preponderance of the evidence, facts that establish a basis for relief on habeas corpus. [Citation.]' " (*In re Cudjo* (1999) 20 Cal.4th 673, 687 [85 Cal.Rptr.2d 436, 977 P.2d 66].) We review the findings of the referee under standards that are well settled. " 'Any conclusions of law, or of mixed questions of law and fact, are subject to independent review. Mixed questions include whether counsel's performance was deficient and whether the deficiency prejudiced the defense. Because the referee can observe the demeanor of the witnesses and their manner of testifying, findings of fact, though not binding, are entitled to great weight when supported by substantial evidence.' " (*In re Scott* (2003) 29 Cal.4th 783, 812 [129 Cal.Rptr.2d 605, 61 P.3d 402]; see also *In re Hamilton* (1999) 20 Cal.4th 273, 296–297 [84 Cal.Rptr.2d 403, 975 P.2d 600].) On the other hand, "this deference is arguably inappropriate when the referee's factual findings are based entirely on documentary evidence." (*In re Cudjo, supra*, 20 Cal.4th at p. 688.)

As explained below, with limited exceptions, we conclude that the factual findings of the referee are supported by substantial evidence.

## II

With respect to the question of juror misconduct, the evidence at the reference hearing disclosed that a man who served on the jury at petitioner's trial, Juror K., had personal experience with heroin, marijuana, cocaine, LSD, and amphetamines. Juror K. testified at the reference hearing that he had said at some point during jury deliberations, when the subject of petitioner's drug use came up: "Well, I'm not trying to tell you anything, but I do have some experience in using drugs, and I've seen a lot of people use drugs, and I've never seen them do what this man has done," that is, "slaughtering his next door neighbors." On the other hand, he told one juror, "if I wouldn't have quit doing what I was doing [referring to his own drug abuse], it possibly could have been me sitting up there," even though, as the juror stated, he was not by nature a violent man. Juror K. did not notice any response from the other jurors, although in his deposition he stated that they may have asked him what effect various drugs had on him. Other jurors also were discussing drugs, and he presumed they had some knowledge of them. Juror K. was

uncertain whether his comments were made during the guilt or the penalty deliberations. Juror K.'s own opinion was that petitioner's crimes were not caused by his drug use.

Another juror, who had served as foreperson, testified that Juror K.'s statements occupied at most five or ten seconds. At the reference hearing, this juror also was unsure whether the statements occurred at the guilt or the penalty phase of trial, but his earlier declaration indicated they took place during guilt phase deliberations. He recalled that Juror K. said "he had taken whatever the drug was, speed-balling, whatever it was that [petitioner] had done, and that, in his opinion, you know, it didn't really evoke the type of reaction that [petitioner] maybe was implying or that his attorneys were implying had occurred to him." Another juror recalled definitely that the comment came during guilt phase deliberations, and that Juror K. said "the drugs didn't affect [petitioner] like it did him [the juror]. And it gave it would give him more strength, made him stronger at the time and kind of like wow man, kind of crazy like."

The referee found: "Juror K[.] told the other jurors that petitioner's sole defense that he committed the murder, if at all, in a state of extreme intoxication was not credible [citation] because, as Mr. K[.] summarized: 'I've seen a lot of people use drugs, and I've never seen them do what this man had done.' [Citation.] Mr. K[.]'s statement was premised on his own personal experience and was not based on the evidence received at trial. [Citation.] On the basis of his personal experience, Mr. K[.] formed the opinion that petitioner lied either about the amount of drugs he had taken or about the effect of those drugs on him. [Citation.] Mr. K[.]'s statements were heard by and discussed with other jurors. [Citation.] The preponderance of the evidence indicates that Mr. K[.]'s statements were made during the jury's guilt phase deliberations. [Citation.]"[2]

Petitioner claims that Juror K.'s comments violated his state and federal constitutional right to trial by an impartial and unbiased jury. He claims that Juror K., and possibly other members of the jury, based their verdict in part on extraneous evidence of Juror K.'s experience with controlled substances rather than on the evidence that was introduced at trial. According to petitioner, the evidence that during guilt phase deliberations Juror K. referred to his own drug use and contrasted his experience with that claimed by petitioner was particularly prejudicial because petitioner's primary defense at the guilt phase was that his drug and alcohol ingestion rendered him unconscious or at least made it impossible for him to have formed the mental state necessary for proof of the crimes.

---

[2] Our resolution of the issue renders it unnecessary to consider respondent's exceptions to the referee's findings.

■ A juror may commit misconduct by receiving or proffering to other jurors information about the case that was not received in evidence at trial. (*People v. Nesler* (1997) 16 Cal.4th 561, 578 [66 Cal.Rptr.2d 454, 941 P.2d 87].) We have explained, however, that "[i]t is not improper for a juror, regardless of his or her educational or employment background, to express an opinion on a technical subject, so long as the opinion is based on the evidence at trial. *Jurors' views of the evidence, moreover, are necessarily informed by their life experiences*, including their education and professional work. A juror, however, should not discuss an opinion explicitly based on specialized information obtained from outside sources. Such injection of external information in the form of a juror's own claim to expertise or specialized knowledge of a matter at issue is misconduct." (*In re Malone* (1996) 12 Cal.4th 935, 963 [50 Cal.Rptr.2d 281, 911 P.2d 468], italics added.)

■ "Jurors bring to their deliberations knowledge and beliefs about general matters of law and fact that find their source in everyday life and experience." (*People v. Marshall* (1990) 50 Cal.3d 907, 950 [269 Cal.Rptr. 269, 790 P.2d 676].) This experience may stem from education or employment, but sometimes it comes from other personal experiences. We previously have explained that illicit drugs and their effects have become a matter of common knowledge or experience, and that "[j]urors cannot be expected to shed their backgrounds and experiences at the door of the deliberation room." (*People v. Fauber* (1992) 2 Cal.4th 792, 839 [9 Cal.Rptr.2d 24, 831 P.2d 249]; see also *Price v. Kramer* (9th Cir. 2000) 200 F.3d 1237 [in a civil rights action claiming police brutality, jurors did not commit misconduct during deliberations when they related their own negative experiences with the police].) Rather, "jurors are expected to bring their individual backgrounds and experiences to bear on the deliberative process." (*People v. Pride* (1992) 3 Cal.4th 195, 268 [10 Cal.Rptr.2d 636, 833 P.2d 643].)

■ Juror misconduct generally raises a rebuttable presumption of prejudice, but "[a]ny presumption of prejudice is rebutted, and the verdict will not be disturbed, if the entire record in the particular case, including the nature of the misconduct or other event, and the surrounding circumstances, indicates there is no reasonable probability of prejudice, i.e., no substantial likelihood that one or more jurors were actually biased against the defendant." (*In re Hamilton, supra,* 20 Cal.4th at p. 296, italics omitted.)

We have explained that the following standards govern our review of claims that jurors have been exposed to extraneous evidence: "To summarize, when misconduct involves the receipt of information from extraneous

sources, the effect of such receipt is judged by a review of the entire record, and may be found to be nonprejudicial. The verdict will be set aside only if there appears a substantial likelihood of juror bias. Such bias can appear in two different ways. First, we will find bias if the extraneous material, judged objectively, is inherently and substantially likely to have influenced the juror. [Citations.] Second, we look to the nature of the misconduct and the surrounding circumstances to determine whether it is substantially likely the juror was actually biased against the defendant. [Citation.] The judgment must be set aside if the court finds prejudice under either test." (*In re Carpenter* (1995) 9 Cal.4th 634, 653 [38 Cal.Rptr.2d 665, 889 P.2d 985]; see also *People v. Danks* (2003) 32 Cal.4th 269, 302–303 [8 Cal.Rptr.3d 767, 82 P.3d 1249].)

We observe that a juror's statement that a defendant's sole defense is not credible does not, of course, by itself constitute misconduct. In the present case, the evidence does not suggest that Juror K. brought highly technical information before the jury. Unlike the juror in question in *In re Malone, supra,* 12 Cal.4th 935, 963, for example, Juror K. did not hold himself out as an expert in a technical matter on the basis of his education or occupation, but merely related his own experience. Under the circumstances, Juror K.'s apparently brief comments merely reflected his own experience as it related to the evidence received at the trial and the inferences that petitioner sought to have the jurors draw from that evidence. His experience, although not shared by the majority of persons, is fairly common. Indeed, Juror K.'s background and experience were revealed during the process of jury selection, when he acknowledged that he was a former addict and alcoholic.

Even if Juror K.'s comments are viewed as constituting misconduct, there is no substantial likelihood that he or any other juror was biased. His comments were not inherently and substantially likely to exercise an improper influence on the jury, nor were they indicative of actual bias on his part. Taking into account the general awareness of persons in our society of the effect of various controlled substances, the mild and brief nature of the remarks, the tentative spirit in which they clearly were offered, and the lack of insistence by Juror K. that his experience should convince other jurors to discredit petitioner's defense, we conclude it is not substantially likely that any juror actually was biased by the comments of Juror K.

## III

Petitioner also claimed entitlement to relief on habeas corpus because, as he alleged, his trial counsel provided constitutionally inadequate representation at the penalty phase of trial. He based his claim primarily on trial counsel's failure to conduct a thorough investigation prior to the penalty phase.

## A

In summary, readily discoverable evidence presented at the reference hearing established that petitioner was born in Ohio in 1949, and his mother Margaret, an unwed teenager, gave him up for adoption at birth. He was placed in foster care, but his mother had second thoughts. When he was approximately one and a half years of age, she requested his return to her care but failed to appear to reclaim him. Ultimately, when he was two and a half to three years of age, after he had been in five foster homes, she did reclaim him and brought him to live with her and her new husband, Edward Lucas, in Montgomery County, Ohio. School records indicate that petitioner appeared for school in the first grade, beaten black and blue. When he was seven years of age, petitioner was placed in the care of a facility for abused and neglected children located in Montgomery County, Ohio. Records dating from that time indicate staff doctors who were employed by the county juvenile facilities and treated petitioner believed that he had been subjected to extreme abuse and that he was psychologically very damaged. Petitioner's care and treatment in public facilities for abused and neglected children appeared in public records that were still available at the time of trial. Several doctors and other persons who had treated petitioner as a child also were still available and provided deposition testimony concerning the abuse he had received at the hands of his family as a young child and the resulting damage to his character and personality.

Petitioner's sister, other relatives, and other persons who easily could be traced and had contact with petitioner's family while petitioner was a child testified at the evidentiary hearing and also stated in depositions and declarations that, as a young child, petitioner had been singled out for physical and emotional abuse, both by his parents and by his stepfather's mother, with whom he frequently resided. Between the ages of three and seven years, he was beaten regularly, given inadequate food, dressed in rags during Ohio winters, forced to sleep under the bed, disciplined by being burned with a cigarette and by the administration of chili peppers to his genitals, and excoriated because of the circumstances of his birth. His sister was not subject to abuse; petitioner often was fed solely on her leftovers.

Petitioner's trial counsel did not discover this evidence.

## B

(1) Our first question to the referee asked that he take evidence on, and determine, what actions were taken by defense counsel to investigate in preparation for the penalty phase of the trial, what results were produced by this investigation, and whether the investigation was conducted in a manner to be expected of reasonably competent counsel.

As the referee found, in preparation for the penalty phase petitioner's lead counsel, James Patterson, spoke with or interviewed petitioner, his wife, Darlene Lucas, his mother, Margaret Lucas, and his sister, Gwendolyn Sue Burgess. According to Patterson, petitioner was "not a great communicator," although Patterson learned that petitioner had a history of drug abuse and had served time in prison for prior convictions. Patterson spoke with him only briefly concerning his childhood. Petitioner did not disclose that he had been abused or had had an unhappy childhood, although petitioner reported he had experienced a good deal of trouble and had run away from home. Patterson intended to present testimony by Darlene Lucas concerning her married life with petitioner and petitioner's good qualities, although she consistently expressed reluctance to testify and stated that petitioner had struck her and that she had ordered him to leave the home after he stole the family's welfare checks to buy drugs. Patterson questioned petitioner's mother, Margaret Lucas, concerning petitioner's youth. She reported that petitioner had been placed with different families and relatives while he was growing up, because he was a problem child who was difficult to control. Patterson did not attempt to contact the relatives with whom petitioner had resided as a child. Margaret also informed Patterson of petitioner's prior convictions, including one of which the prosecution was unaware.

Patterson testified at the reference hearing that his trial notes indicated that he had interviewed petitioner's sister, Gwendolyn Burgess, six days prior to the commencement of the penalty phase of the trial and that she had told him during this telephone interview that petitioner had been a runaway as a child, that he "did not have a normal childhood," and that he had been "punished by a grandmother who kept him under the bed for three days for bedwetting." Patterson believed that the incident in which petitioner had been disciplined for bedwetting was too remote in time and did not necessarily constitute abuse. Indeed, he considered the evidence trivial compared with the brutality of the charged crimes. Patterson's file notes of this telephone interview also indicate that Gwendolyn informed Patterson that petitioner had been in and out of juvenile facilities since he was six years of age, that he repeatedly ran away from school as a child, and that he had been treated unfairly. Her view was that "Lucas should be allowed to live because he has been treated unfairly by the system, [i.e.] no[] rehabilitation[] from age six on although in State custody." Patterson's notes of their conversation also indicate Gwendolyn told him that petitioner was "no trouble" unless he was using drugs, and that he was a good father.

At the reference hearing, Gwendolyn testified she had had one telephone contact with Patterson. She provided Patterson with many examples of petitioner's good qualities, and also informed him of various aspects of petitioner's social history, including that petitioner had been in and out of juvenile institutions from the age of six years and had been a runaway. She

testified that Patterson informed her he would not use this evidence, because it would make petitioner look like a career criminal, that her information was not helpful, and that she would not be called to testify at the penalty phase. He did not ask her for the names of other persons who were familiar with petitioner's social history and, in general, did not appear interested in Gwendolyn's remarks. Gwendolyn testified that she could have directed Patterson to many other family members who could have testified regarding the abuse suffered by petitioner as a child. She also testified that she could have directed Patterson to petitioner's friends, who could have testified regarding his humanity and favorable qualities.

Evidence at the reference hearing also indicated that petitioner's younger brother, Dennis Lucas, attempted to speak to Patterson concerning petitioner's increasing drug use prior to the crime, but that Patterson brushed him off. Similar testimony came from Dennis's wife, Sara Lucas. Patterson explained that he found Dennis's evidence unhelpful because of a report from a defense expert, Dr. Siegel, based on a test for drug residue taken many months after the crime.

Patterson also contacted other witnesses listed at the Armstrong hearing, namely, petitioner's most recent employer, his pastor, a mail carrier, a court bailiff, a public defender who once represented petitioner, and Daniel Sandoval and Randy Croffoot, acquaintances. Patterson reviewed petitioner's 1974 and 1984 probation reports, and retained Dr. William Vicary, a psychiatrist; Dr. David Johnson, a hypnotist; and Dr. Ronald Siegel, a forensic psychopharmacologist who analyzed petitioner's pubic hair for drug content.

Dr. Siegel reported to Patterson that a hair sample provided by petitioner did not confirm that petitioner had been increasing his drug usage in the months preceding the murder. Patterson consulted Dr. Johnson in the hope that his examination of petitioner under hypnosis might support a psychological defense, but Dr. Johnson found that despite petitioner's claim that he could not recall the crimes other than as a confused "dream state," under hypnosis petitioner recalled details of the crimes.

Patterson explained that Dr. Vicary, a psychiatrist, was retained primarily for the guilt phase defense, not to evaluate events from 25 years earlier. Patterson recalled that Dr. Vicary's report indicated he believed petitioner had committed the crimes in order to obtain money to buy drugs.

Dr. Vicary's report, dated subsequent to the commencement of the evidentiary portion of the guilt phase, recounted petitioner's lengthy history of alcohol and drug abuse and noted that petitioner had a prior criminal record. With respect to the charged murders, Dr. Vicary found that petitioner

possessed the intent to kill and that he killed in part because the victims knew him and could have identified him. In his report, Dr. Vicary stated that he believed petitioner was aware of the nature and consequences of his acts despite his intoxication.

Dr. Vicary's written report added that there were some mitigating factors in the case. It stated that petitioner had a traumatic family background in that his stepfather and his maternal grandfather had been alcoholics. The report added that petitioner suffered some mental deterioration prior to the offenses due to his drug and alcohol abuse, and that he was suffering from acute intoxication at the time of the crimes. Finally, the report added that petitioner had behaved well in jail and was "capable of constructive activity and amicable relationships when sober." At the reference hearing, Dr. Vicary testified that no one in the defense team had contacted him to follow up on his remarks concerning mitigating evidence. Also admitted into evidence at the reference hearing was a July 30, 1987 letter that Dr. Vicary wrote to Cocounsel LaPan in which Dr. Vicary stated that he would interview petitioner again for the purpose of gathering data for the penalty phase, and that he would submit an additional report if needed. Dr. Vicary testified at the reference hearing that he also telephoned LaPan to tell him that he believed there were "mitigating elements" in the case, and that if LaPan possessed relevant information, particularly family background evidence, LaPan should inform him. LaPan directed Dr. Vicary to proceed with the additional interview. Dr. Vicary conducted another interview but did not convey the results to counsel, because he assumed they were conducting further investigation into factors in mitigation and would contact him when they needed him. In this last interview with petitioner, Dr. Vicary testified, petitioner stated he had been physically abused as a child by his mother. When Dr. Vicary contacted Patterson's office to determine when additional information would be forthcoming from counsel, he was informed that the case had concluded.

The referee found that the results of counsel's investigation were as follows:

"Darlene Lucas, petitioner's wife, refused to testify at either the guilt or penalty phases of petitioner's trial. Petitioner refused to testify at the penalty phase." From the probation reports and from petitioner's mother and sister, Patterson possessed evidence indicating that "[p]etitioner had been in and out of juvenile facilities as a child, that petitioner frequently ran away from home and school," and that "he was punished for bedwetting by being forced to remain under his bed for up to three days at a time." Furthermore, the referee found, Patterson was aware that "[p]etitioner had been placed with different families and different relatives while he was growing up and had a difficult relationship with his mother."

Referring to witnesses who had been mentioned at the Armstrong hearing, the referee found that petitioner's pastor "would not be able to testify to petitioner's contrition or conversion, that petitioner was concerned about his children, and that petitioner was only an irregular churchgoer whose attendance had declined in the months before the murders." Petitioner's letter carrier informed counsel "that petitioner was a nice person who gave her cold drinks on hot days and seemed like a good neighbor." Petitioner's employer told trial counsel that petitioner was conscientious, honest, and a good employee except when under the influence of drugs. A bailiff informed trial counsel that "petitioner was a good prisoner who gave no trouble to his jailers."

"From Messrs. Sandoval and Croffoot, trial counsel learned about petitioner's drug abuse on the day of the murders. [Citation.]

"From petitioner's 1974 probation report, trial counsel learned petitioner was born in Cincinnati, Ohio. [Citation.] The identity of his biological father was not known. [Citation.] At the age of eight he was placed out of his home as a result of 'runaway, incorrigibility, and dependency neglect.' [Citation.] At the age of ten he was declared a ward of the court because of 'incorrigibility' and sent to St. Michael's School in Scranton, Pennsylvania. [Citation.]"

In addition, the referee found that counsel was aware that "[p]etitioner had a traumatic family background. [Citation.] His father and maternal grandfather had histories of alcohol abuse. [Citation.] He himself had a history of alcohol and drug abuse. [Citation.]"

According to the referee, "Mr. LaPan [cocounsel] undertook no investigation of potential evidence in mitigation." Further, "Mr. Lupori, petitioner's investigator, undertook no investigation of potential evidence in mitigation."

At the reference hearing, Patterson explained his strategy. His hope was to give "a human face" to petitioner, to show his redeeming qualities, and to recount his descent into drug abuse. Patterson intended to call petitioner as a witness to testify concerning his remorse and his intoxication at the time of the crimes. When petitioner's wife refused to testify, petitioner also refused, leaving Patterson with only the witnesses named at the Armstrong hearing. These witnesses, Patterson explained at the reference hearing as he had at the Armstrong hearing, could present evidence of only minimal value, and he believed it would be worse to offer these witnesses than to present no evidence at all. Patterson did not pursue further inquiry into evidence provided by petitioner's sister, Gwendolyn, the probation report, or Dr. Vicary. Patterson did not secure Montgomery County juvenile records or otherwise seek to follow up the lead provided by evidence of petitioner's

dependency record; he felt it sufficed that he had questioned petitioner on the matter. In any event, his plan was to have petitioner testify at the penalty phase regarding these matters. Patterson explained that the heart of his strategy for the penalty phase was to reveal petitioner's problems with drugs and show petitioner's remorse and humanity through the testimony of petitioner and his wife; in comparison, Patterson considered the question whether petitioner was born out of wedlock to be "trivial." Although Patterson did not pursue documentary evidence or other leads regarding petitioner's childhood, he intended for petitioner to testify at the penalty phase regarding his childhood. Still, Patterson believed it was a "long stretch" to believe that such things as being punished by a grandmother who kept him under the bed for three days for bedwetting would lead petitioner to murder his neighbors, and Patterson considered this circumstance trivial compared with the facts of the crimes. He did not pursue Dr. Vicary's report, because he believed that LaPan was handling the contact with Dr. Vicary. At the same time, Patterson did not agree that all the evidence listed by Dr. Vicary actually was mitigating; rather, he believed the thrust of Dr. Vicary's report was devastating both at the guilt and the penalty phases, because it related that petitioner knew what he was doing and committed the crimes in order to obtain money for drugs. In addition, Patterson did not consider particularly mitigating the evidence that petitioner's stepfather and maternal grandfather were alcoholics. He believed that evidence that petitioner's mother placed petitioner with other persons during his childhood was too remote in time to pursue, and he also observed that petitioner's mother told him she had placed him with other families because she could not control him.

The referee outlined inadequacies in the investigation. He determined that "[t]rial counsel relied solely on petitioner's anticipated testimony at the penalty phase. Trial counsel made no effort to obtain records pertinent to petitioner's birth [citation], childhood institutionalization in Ohio and Pennsylvania [citation] or adolescent institutionalization in California [citation]. Counsel made no effort to confirm or otherwise follow up on information in their possession indicating that petitioner was physically and emotionally abused as a child. [Citation.]"

The referee also found that "[t]rial counsel did not adequately follow up on his interview with Gwendolyn Sue Burgess, petitioner's sister," or with petitioner's brother or sister-in-law. Referring to expert testimony in addition to the evidence noted above, the referee believed that "[t]rial counsel's investigation was not conducted in a manner to be expected of reasonably competent attorneys acting as diligent advocates." Petitioner's expert, Michael Burt, a supervising attorney for the death penalty unit in the San Francisco Public Defender's Office, outlined standards in effect for defense of capital defendants at the time of trial, including a general duty to perform a thorough social history of the accused from various sources well in advance

of the penalty phase of trial. The prosecution expert, Judge Robert Parkin, a retired judge and former criminalist and prosecutor, agreed with this characterization of the general standard at the time of trial, although he expressed some ambivalence concerning the ultimate question whether Patterson had performed adequately.

With respect to the findings concerning Patterson's investigation and the information it produced, respondent objects that the referee omitted evidence and reached faulty conclusions.

Respondent objects that the referee did not list Dennis and Sara Lucas (petitioner's brother and sister-in-law) as persons counsel had spoken to in connection with counsel's investigation of the case in mitigation. Dennis and Sara Lucas denied that Patterson had spoken to them except to brush them off when they offered information. In addition, Patterson did not list them at the Armstrong hearing as persons he had contacted. The referee acknowledged that Patterson had had some contact with Dennis and Sara Lucas, but concluded he had not followed up on that contact. We accept the referee's conclusion.

Respondent also objects that the referee did not note that on the eve of the penalty phase of trial, Patterson subpoenaed or attempted to serve a subpoena on Darlene Lucas, Margaret Lucas, Sara Lucas, Dennis Lucas, Verl Lindley, Dan Perez, and Mollie Santistevan. Petitioner essentially concedes the point, although he stresses the tardiness of this action by Patterson.

Respondent takes exception to the referee's conclusion that neither Co-counsel LaPan nor investigator Lupori conducted any investigation of potential mitigating evidence for the penalty phase.

The evidence before the referee adequately supports the conclusion that Patterson carried primary responsibility for both phases of trial and that Lupori and LaPan were not instructed by him to assume responsibility and did not actually assume substantial responsibility for penalty phase investigation. LaPan testified he was not responsible for investigating, developing, or presenting mitigating evidence at the trial.[3] Lupori testified he was not asked

---

[3] As respondent points out, however, LaPan did testify that he suggested the appointment of the hypnotist, although Patterson's testimony indicated that the hypnotist was appointed primarily to evaluate a guilt phase defense of unconsciousness. Patterson testified that he had this doctor appointed in order to evaluate petitioner's claim prior to the guilt phase that petitioner had nothing but a hazy recollection of the crimes. As respondent also contends, LaPan testified that he had read Dr. Vicary's report, although there is no evidence suggesting that he followed up on any of the evidence noted in that report. Rather, LaPan's testimony was that it was subsequent to his involvement in this trial that he first understood that Dr. Vicary's

by counsel to collect mitigating evidence, although if such evidence "came in collaterally" he would give the information to counsel. He testified that 99 percent of his work related to the guilt phase, and the remaining 1 percent involved serving subpoenas on the potential penalty phase witnesses named at the hearing held before Judge Armstrong when Patterson announced he would not call any witnesses for the defense at the penalty phase.[4] In sum, the record reflects that Lupori's investigation of potential evidence in mitigation was negligible.

Respondent takes exception to the referee's findings regarding the results of Patterson's penalty phase investigation. Respondent complains the referee failed to include in his findings the statement by petitioner's mother that she told Patterson that she placed petitioner with different families when he was a child, because petitioner was a "problem," "hard to control," and "in trouble all the time." The referee did not attempt to summarize all of the witness's testimony, but we agree that Patterson did state that petitioner's mother made the quoted statements to him. As respondent also points out, petitioner's mother informed Patterson that petitioner had an out-of-state felony conviction of which Patterson and the prosecutor had been unaware.

Respondent also takes exception to the referee's "incomplete" finding that one of the products of Patterson's investigation was the information establishing that petitioner had a traumatic family background. The finding is based on Dr. Vicary's report, which states: "There are some mitigating factors in this case. They can be discussed as follows . . . Traumatic Family Background . . . .

report contained indications of potential mitigating evidence that should have been investigated. According to Dr. Vicary, neither LaPan nor Patterson ever contacted him to supply the additional information or inquire regarding the further interview Dr. Vicary had conducted with petitioner. When Dr. Vicary telephoned Patterson's office to inquire when Vicary would receive the additional information, he was informed that the case had concluded. As respondent also points out, LaPan testified that he urged petitioner to testify at the penalty phase in order to show his remorse and humanity. Additionally, as respondent states, LaPan prepared a motion requesting that the jury be taken to see death row and compare it to the cells housing other prisoners at San Quentin Prison. Although these efforts constitute preparation, they do not appear to fall within the category of investigation. We believe that the referee's conclusion was substantially accurate—LaPan's investigation of potential mitigating evidence was at most minimal.

[4] Although, as respondent asserts, Lupori did interview petitioner twice, Lupori did not testify that these interviews sought potential mitigating evidence for the penalty phase of trial. Respondent does not point to anything in the record suggesting otherwise. As respondent asserts, Lupori did try, unsuccessfully, to track down evidence of petitioner's treatment at a local health center for a kidney infection or possible drug withdrawal. Lupori testified he was told by the relevant health facility that there was no indication petitioner had come in for treatment, although counsel for petitioner in the present habeas corpus proceeding secured the relevant record, which reflected a visit by petitioner two months prior to the commission of the crimes. The medical record indicated that petitioner complained of having lost 24 pounds during the preceding two weeks.

The defendant's father was an alcoholic, a grandfather was also an alcoholic who had arrests for public intoxication." Respondent objects that the referee's finding is incomplete because it omits Patterson's testimony that he knew of this information but did not believe it constituted evidence of a traumatic background. The record does reflect that Patterson held this opinion.

Respondent also asserts that the referee's finding concerning the results of Patterson's investigation was incomplete because it did not note other statements in Dr. Vicary's report to Patterson. That report characterized petitioner's psychiatric history as "modest" and stated that petitioner had only one psychiatric evaluation as a child due to "some behavior problems," that he had juvenile arrests for running away, possession of a knife, and assaults, and also that it was Dr. Vicary's opinion that petitioner knowingly murdered the victims in order to obtain money for drugs. The record supports this contention with respect to the contents of Dr. Vicary's report.

As respondent contends, the referee's conclusion is incomplete in that the record indicates that Patterson consulted Dr. Siegel, a forensic psychopharmacologist, whose test on petitioner's hair indicated to that expert that petitioner had not increased his drug use in the months preceding the murders, but we also observe that this test was performed many months after the commission of the crimes. Petitioner's witness, Dr. Clark, accepted as an expert in the areas of psychiatry, substance abuse and toxicology, addiction, and medicine and trauma, testified that both at the time of trial and the time of the reference hearing, it was understood among experts in the field that the hair test discloses drug usage only during the 90 days preceding the test, whereas the test in petitioner's case was performed at least seven months after the crimes.

As respondent contends, Patterson also consulted Dr. Johnson, a hypnotist, who reported that petitioner recalled the details of the murders. We add only that the reports obtained from both Dr. Johnson and Dr. Siegel related primarily to guilt phase issues.

Respondent takes exception to several of the referee's findings concerning the manner in which Patterson's investigation was inadequate.

Respondent questions the referee's finding that trial counsel relied solely upon petitioner's anticipated testimony as the source of potential mitigating evidence for the penalty phase. The record indicates Patterson testified that he expected that petitioner's wife also would testify, that her resistance to testifying would be overcome, and that he would be calling a number of other witnesses to testify concerning petitioner's positive qualities and problems with drugs. As noted at the Armstrong hearing and the reference hearing, Patterson considered calling Margaret Lucas, Bert Linley, Dan Perez, Larry

Beyersdorf, Dave Rannow, Molly Santisteven, Daniel Sandoval, Gary Croffoot, and Drs. Vicary, Johnson and Siegel. As petitioner suggests, however, there also was evidence that petitioner's wife made it clear from the outset that she would not testify at the guilt or penalty phases and that Patterson told her that her testimony would not be required. We accept the referee's determination that she refused to testify at either phase of the trial.

Next, respondent takes exception to the referee's finding that Patterson "made no effort to obtain records pertinent to petitioner's birth" or experience in juvenile facilities. Respondent objects that the referee failed to recognize that Patterson had asserted tactical reasons for this omission, in that Patterson believed that the best way to present mitigating evidence was through petitioner and his wife and that petitioner's mother was a dangerous witness in that she might blurt out the circumstance that petitioner had a prior escape conviction. We agree that Patterson offered these reasons at the reference hearing to explain his failure to investigate, but this circumstance does not answer the question whether Patterson's ostensible reasons rendered his failure to investigate further a *reasonable* tactic or strategy.

Respondent takes exception to the referee's finding that Patterson did not investigate further after receiving information suggesting that petitioner had been physically and emotionally abused as a child. Respondent points to Patterson's testimony that he did ask Margaret Lucas, Darlene Lucas, and petitioner to tell Patterson about petitioner's childhood. The referee may not have credited this assertion but, more significantly, Patterson did not claim that he inquired of these persons specifically about instances of abuse.

Respondent evidently concedes that Patterson did not "follow up on Gwendolyn's information that petitioner had been in and out of juvenile facilities as a child, had run away repeatedly from home and school, was a bed wetter to adulthood, and was once punished for bed wetting by being forced to remain under his bed for three days." Respondent again points to Patterson's ostensible reasons for not pursuing the leads provided by Gwendolyn, namely, that petitioner's experience in juvenile facilities would cause the jury to believe that petitioner was a "career criminal," that the bedwetting punishment was too remote in time and did not necessarily constitute abuse, and that bedwetting was trivial compared with the charged crimes. Patterson did offer these reasons for failing to investigate further, but it is questionable whether his decision not to do so was reasonable.

With respect to the referee's finding (citing testimony by defense experts Burt, noted above, and one Dr. Haney, a lawyer and social psychologist) that the investigation was not conducted in a manner to be expected of reasonably competent attorneys, respondent requests that this court recognize that these

two experts are "well-traveled professional opponents of capital punishment" whose opinions thus should count for little, if anything. Respondent also refers to our observation that little weight should be given to an attorney's opinion that asserted ineffective assistance of counsel was prejudicial, because it is the court's function to determine the issue of prejudice. (*In re Ross* (1995) 10 Cal.4th 184, 215 [40 Cal.Rptr.2d 544, 892 P.2d 1287].) The basic message of the witnesses—that the prevailing professional norm in capital defense at the time of trial was that defense counsel should secure an independent, thorough social history of the accused well in advance of trial—was confirmed by respondent's own expert witness, retired Judge Parkin, and is consistent with standards referred to by the United States Supreme Court in *Wiggins, supra*, 539 U.S. at pages 522–523 and other cases.

Respondent asserts that the referee failed to note that, although respondent's expert, Judge Parkin, testifying on the ultimate question of counsel's constitutional adequacy, initially believed that counsel had not provided effective assistance, he later expressed some ambivalence. It is apparent to this court that Judge Parkin was ambivalent. Originally, he gave the opinion that Patterson had not made an informed decision with respect to his penalty phase strategy because he failed to investigate adequately. Subsequently, Judge Parkin acknowledged that Patterson had done more than Judge Parkin first believed, having spoken with petitioner about his background, consulted the 1974 probation report, and conferred with petitioner's family and friends concerning potential penalty phase testimony. This information modified Judge Parkin's previous opinion to the extent that "it provided that he had—at least had more information than I thought he did in reaching the decision not to go forward with the evidence. [¶] I think it would have been better had he gotten the information from Ohio, and he would have had probably a much fuller picture. I'm not sure how much he weighed what he saw in that probation report, but at least he had that information to consider when he did reach the decision that he did reach." Judge Parkin still believed, however, that Patterson, in light of the information available to him, was on notice that further investigation of petitioner's social history was necessary, that minimum standards at the time of trial required preparation well in advance of the penalty phase and investigation into every aspect of the client's life, and that Patterson's investigation was not conducted in a manner to be expected of a reasonably competent attorney.

(2) Our second question asked the referee to determine what information would have been uncovered by a reasonably adequate investigation.

As the evidence at the reference hearing demonstrated, various readily available official public records confirmed that petitioner was born on November 20, 1949 in Glendale, Ohio; that he was born out of wedlock; that at

birth he was surrendered by his mother, Margaret, for adoption; that in August 1950 she requested his return to her care but failed to appear to claim him or to respond to the county welfare board's communications; that he had been in five foster homes in his first two and a half years; that after county authorities sought permanent custody of petitioner, Margaret's new husband, Edward Lucas, objected, and in July 1952 petitioner was released to Margaret and Edward's home in Dayton, Ohio; and that Dayton school officials complained many times to local juvenile welfare officials that, when petitioner was in first grade in 1955, he appeared at school beaten black and blue, with welts on his body. School authorities expelled him from first grade in November 1955 because he was disruptive and ran away.

These records reflect that, through the auspices of the Montgomery County, Ohio juvenile dependency court, petitioner received counseling services in 1956 from the Dayton Child Guidance Center, whose counselors believed he should be removed from his abusive home. Public records indicate that a citizen complaint regarding the abuse suffered by petitioner was sent to juvenile welfare authorities in April 1957.

These records also disclose that in June 1957, when petitioner was seven years of age, his mother brought him to the Montgomery County Children's Services Agency, requesting that it take custody of petitioner and reporting that she could not control him. A report prepared for the purpose of the ensuing dependency proceeding indicates that he had been beaten severely by his parents. Dayton Guidance Center psychiatrists and child welfare workers recommended that petitioner be removed from his home for his own protection. Temporary custody of petitioner as a dependent child was granted to the Montgomery County Child Welfare Board on September 13, 1957, and he was placed in Shawen Acres, a home for abused and neglected children, where his family rarely visited him. His behavior and the recommendation of his psychiatrist caused him to be transferred (still under the court's dependency jurisdiction) to St. Michael's School for Boys in Pennsylvania in June 1959, but he was asked to leave that institution in 1961 because of poor behavior. He was returned to his family but frequently ran away. He was detained in the Juvenile Detention Center in Dayton as a runaway and "incorrigible." He returned to his family but was detained again for theft. In 1962, at the age of 12 years, he was adjudged a delinquent child and was committed to the Ohio Boys Industrial School, a high security juvenile facility housing the most serious juvenile offenders. At the age of 14 years he was sent to California to join his family and shortly thereafter was made a ward of the court and placed on probation in California for curfew violations. Probation was revoked because he ran away from home, and he was placed in a juvenile correctional camp. After running away from the camp, he was placed in a California Youth Authority (CYA) facility. Upon his release, he suffered revocation of parole for auto theft and running away from home.

Petitioner was incarcerated at CYA facilities from February to July, 1965, from November 1965 to July 1966, and from December 1966 to December 1967 and from December 1967 to March 1969.

The nature of the abuse referred to in these readily accessible records was explained by witnesses who lived with or near petitioner when he was between the ages of four and eight years, and who easily could have been located by defense counsel. For the most part, these witnesses were members of petitioner's family or were related by marriage. In summary, they testified that Edward and Margaret drank to excess and became physically and verbally abusive to one another and to petitioner when he was a child. Petitioner was treated as an outcast within the family because he had been born out of wedlock. He frequently was beaten by his parents. His mother sent him and his younger sister Gwendolyn to live with Edward's mother, Bernice Lucas, for long periods. Bernice treated Gwendolyn well but beat petitioner regularly, taunted him because of the circumstances of his birth, subjected him to cruel discipline, and failed to feed and clothe him adequately.

For example, in testimony confirmed in great circumstantial detail by other contemporaneous witnesses, Helen Garcia testified that as a young adult she spent a great deal of time with the Lucas family when petitioner was between the ages of four and eight years, because she was then married to petitioner's cousin and resided near petitioner's grandmother Bernice. Garcia testified that Margaret and Edward's marriage was tempestuous and violent and that they engaged in physical violence in the presence of their children, that Edward was a mean, violent alcoholic, and that petitioner was taunted and ill-treated because of the circumstances of his birth. During this period, petitioner lived mostly with Bernice. Garcia frequently observed petitioner being subjected to beatings by Margaret, Bernice, and occasionally other relatives. For example, she observed Margaret beating petitioner with a belt for taking cookies.

Garcia testified that Bernice hated petitioner, beat him, and starved him. Every time Garcia saw Bernice and petitioner together, Bernice was beating him, yelling at him, and abusing him as a "bastard." Sometimes Bernice beat him with a belt or slipper, and sometimes she kicked him. Bernice required petitioner to sleep on the floor behind a stove, under a bed, or on bare springs out on the porch as punishment for bedwetting. Bernice refused to permit him to eat with the rest of the family and required him to eat his sister's leftovers. Bernice dressed petitioner in tattered clothing in both summer and winter.

Garcia observed that petitioner avoided and seemed afraid of both Margaret and Bernice. Garcia observed burns on petitioner's arm, stripes and bruises on his back from beatings, and sores on his feet that matched the

holes in his shoes; she also had heard that Bernice had rubbed chili on petitioner's genitals in response to a bedwetting incident.

Garcia sometimes provided babysitting for petitioner and observed that he appeared starved, hoarded food, and expected her to beat him when she found he had hidden a supply of food. Garcia testified that in contrast to the treatment given petitioner, his younger half sister Gwendolyn, who also resided with Bernice, was well treated. In one incident that Garcia recalled from December of 1956, petitioner, then age seven years, appearing at the window of Garcia's home early in the morning in thin, ripped clothing, stated that his grandmother had thrown him out of the house for wetting his bed. He was shivering and his feet were cracked and bleeding. After fruitless appeals to Margaret, to Garcia's husband, and even to Bernice, Garcia telephoned the local child protective services agency to report petitioner's situation. She called the agency again a few months later, in 1957, when she observed a burn on petitioner's arm. Garcia was aware that soon thereafter, petitioner was removed from the home and placed in a home for abused and neglected children, Shawen Acres. He remained in various institutions, and thereafter Garcia learned that petitioner's parents and siblings had left Ohio without him. She saw petitioner again in 1983 at a family wedding. Ms. Garcia declared: "I recall the treatment of [petitioner] when he was young. What that kid went through! Larry's childhood was unbelievable. I think an animal might have been treated better than he was. If there was ever a case of how you treat kids when they are little affecting how they are as adults, it is [petitioner's] case." Garcia's sister, Sylvia Robertson, confirmed many of the same instances of abuse and neglect reported by Garcia. Robertson considered petitioner's situation pathetic at the time and observed him eating like a starving animal when he visited Garcia. Robertson stated that defendant had nothing good in his life as a young child, and no one to protect him.

Gwendolyn Burgess, petitioner's younger sister, added that their mother Margaret shunned petitioner when he was a child, that he began running away at the age of six years, that Gwendolyn believed petitioner had witnessed his mother signing him over to juvenile welfare authorities, and that petitioner thereafter lived in juvenile facilities for much of his childhood. Gwendolyn confirmed that Bernice kept petitioner under a bed for three days as punishment for bedwetting, and that petitioner always was blamed in the family when anything went wrong, while she, Gwendolyn, was favored and treated well. Her father and her maternal grandfather were alcoholics. Petitioner had a drinking problem before he began to consume drugs. Gwendolyn confirmed petitioner's physical and emotional abuse at the hands of Edward, Margaret, and Bernice. Gwendolyn recalled that when she and petitioner resided with Bernice as children, Gwendolyn used to bring him food when he was confined under his bed for bedwetting. Gwendolyn added that Edward and Margaret engaged in screaming matches and violent altercations in the

presence of the children. When Edward caught petitioner smoking, he forced petitioner to eat a pack of cigarettes. Edward told her that petitioner's natural father had been incarcerated and subsequently was executed.

Accounts of petitioner's abuse also were confirmed by the deposition testimony and declaration of his cousins. Richard Welch, a cousin who is two years older than petitioner and also lived with Bernice during the period referred to by Garcia, specified that petitioner suffered frequent beatings at the hands of Bernice, Margaret, and Edward, especially when Edward was intoxicated. Richard observed Margaret punish petitioner by burning him with a cigarette. According to Richard, petitioner exhibited fear of his parents as a child. Jacqueline Lamb, petitioner's older cousin who lived with petitioner at Bernice's house when petitioner was a young child, also confirmed in her declaration that petitioner was treated cruelly as a young child, forced to sleep on the floor behind the stove, and beaten. She said that Bernice treated petitioner "like a dog" and that, unlike the other children who resided with her, petitioner had no protector. When Edward visited he brought treats for Gwendolyn or took her out to eat, but he only abused petitioner. During her less frequent visits, Margaret pushed petitioner away from her and cursed him. Jacqueline recounted seeing Bernice rubbing chili powder on petitioner's buttocks and genitals to punish him for bedwetting. Jacqueline saw petitioner later when he was 11 or 12 years of age, when he was living with his parents, and she observed that he was "thin as a rail" and covered with bedsores. She stole food to give to him. Another of petitioner's cousins, Larry Lambert, who was born in 1936 and resided near petitioner's family, stated that he recalled hearing petitioner's mother Margaret telling petitioner, when he was a young child, that she wished he were dead and that she had never wanted him. Margaret punished petitioner's bedwetting by making him lie all day in a wet bed and by withholding food. Petitioner had bedsores as a consequence. Margaret beat petitioner frequently when he was between four and six years of age. Petitioner was sent to school dressed in filthy clothing and shoes with holes in them, although the family had enough money for basic purchases. Similarly, an aunt, Mildred Welch, who was acquainted with petitioner's mother Margaret before petitioner was born, testified that Margaret did not want petitioner. The aunt observed Bernice's cruelty to petitioner on account of the circumstances of his birth, saw Bernice whip him regularly, and saw her direct that petitioner sleep on the floor behind a coal stove. Mildred observed Bernice rub chili pepper on petitioner's buttocks and genitals as a punishment for urinating on himself. When petitioner was a young child and residing with his parents, Mildred saw that petitioner had a long, deep, and infected wound on the back of his head. Mildred confronted Edward about the injury, and he responded, "By God I beat the piss out of him! He wouldn't mind me." Petitioner always seemed very thin, looked as if

he did not get enough to eat, and begged for food when he visited her after she moved into her own home.

Connie Cruea, who had been a student teacher in petitioner's elementary school in 1956, stated in her declaration that she recalled that at that time, petitioner was thin and unkempt and came to school bearing bruises.

Dennis Lucas, petitioner's younger brother, stated in his deposition that both Margaret's father and Edward were alcoholics, that petitioner was a protective, loving older brother (10 years Dennis's senior), that petitioner's wife pressured him into experimenting with cocaine, that drugs changed petitioner significantly, and that his drug use spiraled very suddenly and his condition worsened quickly in the month or several weeks before he was arrested for the murders.

At the evidentiary hearing, petitioner proffered videotaped (and transcribed) deposition testimony of various witnesses, including psychiatrists and psychologists who had treated or observed petitioner in various juvenile facilities and persons who were aware of the abuse that was endemic in the institutions in which petitioner had been placed as a child.

Dr. Howard Fink, who served as chief psychologist at the Dayton Child Guidance Center when petitioner was treated there in 1957, testified in his deposition that records dating from the 1950's indicated that petitioner's history was one of early rejection, abandonment, neglect, and abuse by his family. He believed that the abuse petitioner had received constituted "the kind of care that fosters pathology later on." He confirmed that petitioner had been removed from the family home because of mistreatment and neglect. Dr. Fink believed that petitioner was so dam aged by abuse by the time he was removed from his home at the age of seven years that it was already too late to help him.

Dr. Daniel Waldstein, a psychologist who treated petitioner at the Dayton Child Guidance Center when petitioner was nine years of age, testified in his deposition that children of grossly abusive and neglectful parents were removed from their homes and sent to Shawen Acres. Petitioner's mother was extremely unreliable about visiting petitioner at Shawen Acres.

Dr. Earl Mayo, a Dayton psychologist who worked for the juvenile court, evaluated petitioner in 1962 and at that time reported evidence of gross neglect and early maternal rejection and mistreatment. He referred to petitioner's "life long pattern of deprivation" and "grossly deprived background" and stated that, because of this experience, petitioner's behavior vacillated between extreme dependency and episodes of paroxysmal aggression and

hostility. In 1962, Dr. Mayo diagnosed petitioner as having a severe "adjustment reaction of childhood" arising from parental mistreatment and institutional failure.

Dr. Martha Ebrecht, a Dayton psychiatrist who worked for the Dayton Guidance Center, evaluated petitioner in 1962 and concluded that petitioner had been beaten and rejected by his parents.

Petitioner's probation counselor at the Juvenile Detention Center in Dayton, Darold Askeland, recalled the unusual degree of psychological damage inflicted on petitioner at a young age. He also recalled seeing petitioner eating like a "starved animal," a circumstance Askeland interpreted as an indication of earlier abuse and neglect. Petitioner's mother never visited him at the detention center. Askeland determined that petitioner needed psychiatric treatment in a residential treatment facility, but he was not admitted to such a center. He presented severe behavior problems such as running away and stealing, without being mentally ill. It was this behavior that secured his transfer to the Boys Industrial School, a placement for which Askeland considered petitioner to be too young. Askeland reported that petitioner was focused on gratifying his own needs, did not know or care about the difference between right and wrong, was impulsive, and could not tolerate frustration.

Concerning conditions at the institutions in which petitioner had been confined, a 13-year resident at Shawen Acres, Oran Fisher, who was an older resident while petitioner was residing there, testified that the place was "mean," that the supervisors abused the residents, including Fisher, with grotesque punishment for trivial offenses or for no offense at all, and that some residents were subject to sexual abuse. He recounted an appalling tale of extreme cruelty and abuse on the part of adults who resided with and supervised the children, and testified that abuse was commonplace, as was sexual abuse of children by older children. He recalled petitioner as a problem child who would not "go along with the program" but just wanted to "do what he wanted to do." Petitioner's cousin, Larry Lambert, also stated in his declaration that he had been housed at Shawen Acres after his mother died, and that it was an unpleasant place where sexual abuse of children occurred. A former inmate at one of the CYA facilities in which petitioner had been confined spoke of the abysmal conditions there and of physical and sexual abuse that was commonplace at that institution during the period of petitioner's confinement.

In addition, Dr. Christ George, a former director of education at the Boys Industrial School from 1966–1972, testified in his deposition that the facility's goal was punishment, not rehabilitation, and that it was a grossly

overcrowded warehouse of children without adequate educational or vocational programs. A statement by Dr. Clemens Bartollas, who had studied conditions at the Boys Industrial School during the 1960's, indicated that the treatment of inmates was "repressive," "brutal," and "sadistic," that young "status offenders" were housed with serious criminals, that he knew of instances of sexual abuse, torture, flogging, and terrorizing of inmates by guards who operated in "goon squads," and that there was racially motivated violence against inmates. As a person who was aware of the conditions at the time petitioner resided at that facility and who had spent his career beginning in 1969 in the Ohio juvenile justice system, Dr. Bartollas's opinion was that an inmate who was 12 or 13 years of age when he arrived would have a "horrible time" with other inmates and would be terrorized by staff and inmates alike. There also was evidence that when the Ohio Youth Services Advisory Board examined conditions at the Boys Industrial School in 1964, it reported to the Ohio Governor that conditions there were "deplorable," calling it an "overcrowded, human warehouse" without resources for any effort at rehabilitation.

In addition, various mental health experts testified, on the basis of their review of the documentary record and their recent evaluations of petitioner, that the severe abuse and abandonment suffered by petitioner at the hands of his family caused various forms of psychological damage that affected him in childhood and adulthood, including exaggerated dependency needs, poor impulse control, alienation, feelings of worthlessness, and vulnerability to drug and alcohol abuse. These experts also identified signs of mild brain damage or organic brain dysfunction and attention deficit disorder.

As to the subject of favorable aspects of petitioner's character, petitioner's employer would have testified that petitioner's behavior changed radically as he increasingly came under the influence of drugs, and that he was highly intoxicated on the evening of the murders. Friends and members of petitioner's family would have testified that petitioner had been a good friend, a reliable and kindly brother and father, a Good Samaritan, and a reliable worker until approximately six months before the commission of the crimes, when he began to abuse cocaine and amphetamines and entered a downward spiral of mental and physical disintegration and personality change.

Having reviewed the above evidence, the referee found that credible evidence in mitigation was "independently available from multiple sources." Regarding petitioner's childhood, the referee declared: "Adequate investigation would have disclosed the existence of evidence that petitioner was physically and emotionally abused as a child and spent much of his life in institutions in which he suffered abuse and neglect. As a result, he developed mental and emotional disabilities that affected his behavior at the time of the offenses of which he was convicted."

The referee found specifically that reasonably adequate investigation would have disclosed that as a child, petitioner lived in poverty in unsanitary conditions, that his parents engaged in physical and emotional abuse, and that his stepfather, Edward Lucas, was a violent alcoholic. The referee concluded that petitioner was beaten by Edward, Darlene, and Bernice Lucas, that Bernice hated him, and that she forced petitioner "to sleep either on the floor behind the stove or on an outdoor porch on uncovered bedsprings. [Citation.] As punishment for bedwetting, [Bernice] rubbed chili peppers on his genitals." The referee also referred to evidence reflecting that as a child, "petitioner had whip marks and blisters on his back from the beatings he received [citation], burns on his body consistent with having been pushed into a stove [citation], and multiple cigarette burns on his arms and hands." The referee also determined that a reasonably competent investigation would have disclosed that as a child, petitioner was afraid of Darlene and Bernice, and that he was not given enough food. Furthermore, the referee found, reasonable investigation would have produced evidence establishing that petitioner suffered abandonment, severe trauma, and extreme neglect as a child. As for the effect of this abuse on petitioner, the referee found that reasonable investigation would have produced evidence demonstrating that "[t]here was a direct connection between the trauma suffered by petitioner as a child and his development and conduct as an adult."

Regarding petitioner's institutionalization, the referee found that he was housed in Shawen Acres, a home for abused and neglected children. The referee added that: "Petitioner was physically, sexually, and emotionally abused by his Shawen Acres cottage parents." Further, "in 1957 petitioner was a patient at the Child Guidance Center." The referee also found that "Petitioner was committed to the permanent custody of the State of Ohio on June 1962 and placed in the Boys Industrial School, a juvenile corrections facility in Lancaster, Ohio." The referee added that petitioner was released from the Boys Industrial School in 1964 and was incarcerated in various CYA facilities from 1965 to 1969. In addition, "[t]he atmosphere at the various institutions in which petitioner was incarcerated is characterized by intimidation, violence, and sexual and physical abuse. [Citation.] While housed at [the Youth Authority facility at] Preston, petitioner attempted suicide. [Citation.]"

The referee found that "a number of witnesses described petitioner as kind and thoughtful and a good family person whose behavior deteriorated" due to drug abuse.

Respondent takes exception to a number of the referee's findings with respect to the additional evidence that would have been disclosed by an adequate investigation. Respondent contends that the referee erred in finding

that evidence was available to Patterson indicating that as a small child, petitioner had "whip marks and blisters on his back from the beatings he had received [citations], burns on his body consistent with having been pushed into a stove [citations], and multiple cigarette burns on his arms and hands [citations]." Respondent takes exception "to the extent that Helen Garcia did not know what caused the red marks and blisters she saw on a single occasion on petitioner's back."

The exception is not well taken. Garcia legitimately inferred from her observation of the many beatings received by petitioner that the source of the marks on his back was a beating.[5] Richard Welch also testified that he observed petitioner's mother discipline petitioner by burning his skin with a cigarette.

Respondent also takes exception to the referee's finding that petitioner "was physically, sexually, and emotionally abused by his Shawen Acres cottage parents." Respondent is correct that, in support of this conclusion, the referee cited the deposition of Oran Fisher who, although he asserted that many of the adult supervisors at Shawen Acres were grossly abusive and that he himself had suffered abuse, did not state that he had seen petitioner being abused. In his declaration, Larry Lambert also stated he had heard that residents were sexually abused by Shawen Acres staff, but he also did not recount any incident specifically involving petitioner. The referee legitimately could infer, however, from Fisher's account of the severe abuse meted out to any inmate who did not obey the abusive adult supervisors at Shawen Acres, that petitioner suffered abuse for his failure to "go along with the program."

Respondent takes exception to the finding that the institutions in which petitioner was incarcerated were characterized by an atmosphere of intimidation, violence, and sexual abuse. The exception is not well taken. As respondent notes, Abu Quadir El-Amin, who had been an inmate at a CYA facility where petitioner was incarcerated, did not observe any person abusing petitioner. The witness stated, however, that sexual and physical abuse of inmates by other inmates was common. Documentary evidence of the harsh conditions at various CYA facilities also was introduced. In addition, as noted, Oran Fisher testified in his deposition that he had been a resident at

---

[5] As noted, Garcia stated that she saw Darlene beat petitioner with a belt for taking cookies, that Bernice hated petitioner and beat him every time Garcia saw them together, that Bernice used to hit him with a belt, a slipper, a spatula, and anything she had around, reviling him as a "bastard," that when petitioner fled to her home, Garcia saw that he had red stripes in a crisscross pattern and blisters on his back from being beaten, that she observed Bernice hit petitioner's buttocks, back, legs, and head, that Garcia saw a burn on his arm that she believed was inflicted on one of the frequent occasions when Bernice beat petitioner while he was in close proximity to a heating stove, and that Garcia finally reported a burn she saw on petitioner's arm to the local child protective services.

Shawen Acres when petitioner was there; that he, Oran, himself suffered physical, sexual, and emotional abuse at the hands of his Shawen Acres cottage parents; that it was a "mean place to be"; that he believed such abuse by adult supervisors to be commonplace; and that older children also physically and sexually abused younger children there. As has been noted, Larry Lambert declared he was aware that staff at Shawen Acres had behaved abusively during the period of petitioner's residence there. In addition, there was evidence from Drs. Christ George and Clemens Bartollas regarding the deprivation and overcrowding that was characteristic of the Boys Industrial School when petitioner was there and of the brutality and sexual abuse visited upon inmates by staff and other inmates. In addition, there was evidence that the Ohio Youth Services Advisory Board described conditions at the Boys Industrial School as deplorable during the period of petitioner's incarceration there. Respondent is correct, however, that the weight of such evidence, were it admitted at a penalty phase proceeding, would be diminished substantially if the proponent could not establish personal experience of abuse or hardship.

Respondent takes exception to the finding that petitioner attempted suicide while at the Preston CYA facility. We agree that the finding is not based on substantial evidence.

Respondent also takes exception to the referee's finding that numerous witnesses at the evidentiary hearing described petitioner as "kind and thoughtful and a good family person whose behavior deteriorated after he began using drugs." Respondent objects that this finding fails to reflect the witnesses' unawareness of petitioner's criminal history or their decision "to minimize petitioner's selfish conduct." It is true that the testimony of these witnesses might carry less weight than it otherwise would, had the witnesses not been ignorant of the charged offenses or of petitioner's many other crimes. It is true, nonetheless, as the referee found, that there were a number of witnesses who could have testified about petitioner's kindness and other good qualities. Such evidence, of course, could have opened the door to very damaging rebuttal.

(3) Our third question asked whether competent counsel, after conducting an adequate investigation, would have introduced evidence in mitigation at the penalty phase of the trial, especially considering the potential for rebuttal evidence that reasonably would have been available to the prosecution.

With respect to the question whether counsel reasonably might decide not to present evidence of childhood abuse, institutional failure, and petitioner's positive qualities because of the potential for rebuttal evidence, as the referee found there was additional rebuttal evidence in the form of petitioner's prior convictions, including a Wisconsin conviction for robbery and escape of

which the prosecutor was unaware. The former prosecutor who had represented the state at petitioner's trial declared that if petitioner had introduced evidence at the penalty phase suggesting he had been victimized as a child, the prosecutor would have sought to introduce evidence demonstrating how petitioner had victimized others throughout his life. He also would have proffered evidence of petitioner's petty theft and marijuana offenses to rebut any evidence that petitioner was a nice person.

The potential rebuttal also included evidence that from a very early age, petitioner demonstrated lack of conscience, a propensity for violence, and defiance of authority that did not respond to psychotherapy and that he committed criminal offenses as a juvenile, was subject to temper tantrums and uncontrollable rages as a child, was destructive, and sought only to please himself. Documentary evidence was admitted showing that petitioner's mother placed defendant with the Montgomery County Children's services in 1957 because she could not handle him. He was expelled from first grade in part because of his temper and his violence toward other children. As a young child he stole, ran away, and set fires. A psychologist's report filed with the Montgomery County juvenile welfare agency in 1962 described petitioner as the product of a grossly deprived background, but reported he was subject to "paroxysmal aggression." Treating psychiatrists labeled petitioner a "psychopath" in 1959 and a "sociopath" in 1962. Also of note is that, despite the evidence of petitioner's mother's cruelty to him when he was a child, it appears that petitioner and his family were residing with her at the time of the murders.

With respect to the question of what rebuttal evidence reasonably would have been available to the prosecution, the referee found as follows:

"Petitioner had been convicted in 1966 for grand theft auto, burglary, and carrying a concealed weapon; in 1969 for burglary; for carrying a concealed weapon; in 1973 for passing bad checks, auto tampering and possession of a controlled substance; and in 1979 for obstruction of justice. He had been arrested in 1970 for petty theft and in 1983 for battery on his wife. [Citation.] He had also been convicted for assault with a deadly weapon, resisting arrest, and battery on a police officer. [Citation.]" The referee added that evidence concerning petitioner's childhood experience might have led to the admission of evidence of petitioner's 1973 robbery and escape convictions in Wisconsin.

The referee also found that rebuttal evidence could have included evidence that "[p]etitioner struck his wife twice over the course of their marriage." Further, "[I]n the months immediately preceding the murder of the Marriotts, petitioner took his wife's welfare check, a camera, and two rings in order to

buy drugs." Finally, the referee found there was potential rebuttal evidence that "[p]etitioner was diagnosed at the approximate age of 10 by Dr. James Cunningham, medical director of the Dayton Child Guidance Center, as a 'psychopath' or 'sociopath.' "

The referee concluded that "[r]easonably competent attorneys acting as diligent advocates would have introduced the evidence in mitigation that an adequate investigation would have disclosed. Trial counsel's decision not to introduce evidence in mitigation had no sound strategic or tactical basis." Our own view, however, is that much of the rebuttal evidence could cause competent counsel not to present evidence of institutional failure and positive character traits, although we do not believe such evidence would be admissible to rebut petitioner's experience of rejection and abuse at the hands of his family.

Respondent takes exception to the referee's conclusions, contending that Patterson's strategy was reasonable in light of the information he had available to him, that Patterson intended to present witnesses to offer testimony concerning petitioner's humanity and his drug use, but that when petitioner and his wife refused to testify, Patterson reasonably decided—with petitioner's concurrence—not to present evidence.

The question we posed, however, was whether, assuming trial counsel's investigation was inadequate (as assumed in our question No. 2), competent counsel would have introduced the additional information that would have been disclosed by an adequate investigation.

Respondent takes exception to the referee's findings with respect to the rebuttal evidence that reasonably would have been available to the prosecution. Respondent correctly notes that petitioner's Wisconsin convictions occurred in 1976, and that the convictions were for escape and robbery. Respondent also is correct in observing that the 1974 probation report indicates petitioner not only was arrested but pleaded guilty to petty theft in 1970. In addition, respondent is correct with regard to the age at which petitioner was diagnosed as a psychopath or sociopath, that a 1962 report noted that petitioner was 12 years of age when diagnosed as antisocial and as "sociopathic personality [a]nti-social type."

As respondent also states, the referee's report omitted some potential rebuttal evidence. We agree with respondent that there was evidence that "tended to show that petitioner was institutionalized because he was a deeply-disturbed child who set fires, attacked children and adults, was stealing from stores, constantly ran away from home and school [and institutional placements], and was generally uncontrollable." As respondent

points out and our review of the record confirms, as a child petitioner did receive some psychiatric treatment after the age of seven years but failed to respond, was subject to temper tantrums and rages, did not respond to efforts to teach him self-control, and was considered lacking in conscience and beyond help by some mental health professionals.

In addition, as respondent notes, Judge John Watson, formerly a deputy district attorney and the prosecutor at petitioner's trial, testified that if defense counsel had presented evidence to demonstrate that petitioner had been the victim of childhood abuse, the prosecution would have sought to introduce evidence regarding petitioner's early antisocial behavior. Judge Watson also testified that if petitioner had introduced such evidence of childhood abuse, and assuming that at the time of trial he possessed or could have secured copies of petitioner's probation reports, the prosecution would have used these reports in rebuttal because they contained an indication that petitioner had informed his probation officer that he had a "normal family life."

## C

The general principles that are applicable to petitioner's claim that he received constitutionally inadequate representation are settled. As we recently have summarized: "Petitioner had the right to the effective assistance of counsel at trial, and thus was 'entitled to the reasonably competent assistance of an attorney acting as his diligent and conscientious advocate.' [Citation.] A defendant claiming ineffective representation bears the burden of proving by a preponderance of the evidence both (1) that counsel's performance was deficient, i.e., that the representation fell below an objective standard of reasonableness, and (2) that there is a reasonable probability that, but for counsel's unprofessional errors, the result would have been more favorable to defendant, i.e., a probability sufficient to undermine confidence in the outcome. [Citations.]" (*In re Ross, supra,* 10 Cal.4th at p. 201; see *Strickland v. Washington* (1984) 466 U.S. 668, 688, 694 [80 L.Ed.2d 674, 104 S.Ct. 2052] (*Strickland*).)

## D

With respect to the question of what constitutes an "objective standard of reasonableness" for attorney performance, the United States Supreme Court recently explained: "We have declined to articulate specific guidelines for appropriate attorney conduct and instead have emphasized that '[t]he proper measure of attorney performance remains simply reasonableness *under prevailing professional norms.*' " (*Wiggins, supra,* 539 U.S. at p. 521, italics added.) But "before counsel undertakes to act, or not to act, counsel must make a rational and informed decision on strategy and tactics founded upon

adequate investigation and preparation." (*In re Marquez* (1992) 1 Cal.4th 584, 602 [3 Cal.Rptr.2d 727, 822 P.2d 435].)

Although "a court must indulge a 'strong presumption' that counsel's conduct falls within the wide range of reasonable professional assistance" (*Bell v. Cone* (2002) 535 U.S. 685, 702 [152 L.Ed.2d 914, 122 S.Ct. 1843]), nonetheless, counsel's alleged tactical decisions must be subjected to "meaningful scrutiny." (*In re Avena* (1996) 12 Cal.4th 694, 722 [49 Cal.Rptr.2d 413, 909 P.2d 1017].) Tactical decisions must be informed, so that before counsel acts, he or she " 'will make a rational and informed decision on strategy and tactics founded on adequate investigation and preparation.' " (*Ibid.*; see also *In re Jones* (1996) 13 Cal.4th 552, 564–565 [54 Cal.Rptr.2d 52, 917 P.2d 1175].)

As the United States Supreme Court has instructed: "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." (*Strickland, supra*, 466 U.S. at pp. 690–691.)

In determining whether counsel's performance in petitioner's case was constitutionally deficient, we are guided principally by the high court's opinion in *Wiggins, supra*, 539 U.S. 510. In that case, after a Maryland state court trial, *Wiggins* was convicted of robbing an elderly woman and drowning her in the bathtub of her apartment. The case proceeded to a sentencing hearing before a jury, and defense counsel moved to bifurcate the hearing in order to demonstrate, first, that the defendant was not personally responsible for the victim's death. If they were unsuccessful, defense counsel proposed, then they would present evidence in mitigation. Counsel did not wish to "dilute" the evidence related to the issue of culpability by introducing the mitigation evidence. The trial court denied the motion for bifurcation and counsel decided not to present evidence in mitigation.

Defense counsel informed the trial court what evidence in mitigation they would have presented had the court agreed to bifurcation. Counsel "explained that they would have introduced psychological reports and expert testimony demonstrating Wiggins' limited intellectual capacities and childlike emotional state on the one hand, and the absence of aggressive patterns in his behavior,

his capacity for empathy, and his desire to function in the world on the other. [Citation.] At no point did [counsel] proffer any evidence of petitioner's life history or family background." (*Wiggins, supra,* 539 U.S. at p. 516.)

The defendant challenged the conviction on the ground that he had received ineffective assistance of counsel. The high court explained that its focus was not on whether counsel should have presented a case in mitigation, but on "whether the investigation supporting counsel's decision not to introduce mitigating evidence of [the defendant's] background was itself reasonable." (*Wiggins, supra,* 539 U.S. at p. 523, italics omitted.)

In reviewing the adequacy of defense counsel's legal representation at the penalty phase, the high court explained that defense counsel had turned to three sources for investigation. First, a psychologist tested the defendant and identified some cognitive difficulties and evidence of personality disorder. The psychologist's report did not reveal anything about the defendant's life history. Second, counsel possessed a presentence investigation report prepared by the division of probation and parole. This report contained a "one-page account of [the defendant's] 'personal history' noting his 'misery as a youth,' quoting his description of his own background as ' "disgusting," ' and observing that he spent most of his life in foster care." (*Wiggins, supra,* 539 U.S. at p. 523.) Third, defense counsel also secured Baltimore City Social Services Department records of the defendant's various foster care placements.

The United States Supreme Court determined that counsel's decision not to expand the investigation into the defendant's life history beyond what had been discovered in the probation report and the social services report "fell short of the professional standards that prevailed in Maryland in 1989." (*Wiggins, supra,* 539 U.S. at p. 524.) "[S]tandard practice in Maryland in capital cases at the time of Wiggins' trial included the preparation of a social history report." (*Ibid.*) "Counsel's conduct similarly fell short of the standards for capital defense work articulated by the American Bar Association (ABA)—standards to which we long have referred as 'guides to determining what is reasonable.' [Citations.] The ABA Guidelines provide that investigation into mitigating evidence 'should comprise efforts to discover *all reasonably available* mitigating evidence . . . .' [Citation.] Despite these well-defined norms, however, counsel abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources. Cf. [ABA Guidelines] 11.8.6, p. 133 (noting that among the topics counsel should consider presenting are medical history, educational history, . . . *family and social history,* [and] prior . . . juvenile correctional experience . . . .)" (*Wiggins, supra,* 539 U.S. at p. 524.)

In *Wiggins, supra*, 539 U.S. at page 525, the limited investigation into potential evidence in mitigation not only was unreasonable under then current general standards for investigation, it "was also unreasonable in light of what counsel actually discovered" in the defendant's background. The department of social services report revealed that the defendant's mother was an alcoholic, that the defendant "was shuttled from foster home to foster home and displayed some emotional difficulties while there; he had frequent, lengthy absences from school; and, on at least one occasion, his mother left him and his siblings alone for days without food." (*Ibid.*) The United States Supreme Court determined that "any reasonably competent attorney would have realized that pursuing these leads was necessary to making an informed choice among possible defenses . . . ." (*Ibid.*)

The high court also pointed to the efforts counsel did undertake at the penalty phase proceedings. The record disclosed that counsel's "failure to investigate thoroughly resulted from inattention, not reasoned strategic judgment. Counsel sought, until the day before sentencing, to have the proceedings bifurcated into a retrial of guilt and a mitigation stage. . . . In other words, prior to sentencing, counsel never actually abandoned the possibility that they would present a mitigation defense. Until the court denied their motion [for bifurcation], then, they had every reason to develop the most powerful mitigation case possible." (*Wiggins, supra*, 539 U.S. at p. 526.)

The high court also rejected the idea propounded by the Maryland Court of Appeals that "because counsel had *some* information with respect to petitioner's background—the information in the PSI [probation report] and the DSS records [social service agency records]—they were in a position to make a tactical choice not to present a mitigation defense. [Citation.] In assessing the reasonableness of an attorney's investigation, however, a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further. Even assuming [counsel] limited the scope of their investigation for strategic reasons, *Strickland* does not establish that a cursory investigation automatically justifies a tactical decision with respect to sentencing strategy. Rather, a reviewing court must consider the reasonableness of the investigation said to support that strategy." (*Wiggins, supra*, 539 U. S. at p. 527.)

The United States Supreme Court declared that, in light of what was revealed in the probation and social services agency reports, "counsel chose to abandon their investigation at an unreasonable juncture, making a fully informed decision with respect to sentencing strategy impossible." (*Wiggins, supra*, 539 U.S. at pp. 527–528.) The court concluded: "Counsel's investigation into Wiggins' background did not reflect reasonable professional judgment. Their decision to end their investigation when they did was neither

consistent with the professional standards that prevailed in 1989, nor reasonable in light of the evidence counsel uncovered in the social services records—evidence that would have led a reasonably competent attorney to investigate further. Counsel's pursuit of bifurcation until the eve of sentencing and their partial presentation of a mitigation case suggest that their incomplete investigation was the result of inattention, not reasoned strategic judgment. In deferring to counsel's decision not to pursue a mitigation case despite their unreasonable investigation, the Maryland Court of Appeals unreasonably applied *Strickland*." (*Id.* at p. 534.)

█ As in the *Wiggins* case, our primary focus is not on evaluating whether, in light of the evidence in their possession, counsel properly decided not to present evidence in mitigation. "Rather, we focus on whether the investigation supporting counsel's decision not to introduce mitigating evidence of [petitioner's] background *was itself reasonable*." (*Wiggins, supra*, 539 U.S. at p. 523.) After careful scrutiny of the record, we conclude counsel's representation fell below an objective standard of reasonableness.

█ Lead counsel's failure to investigate petitioner's early social history was not consistent with established norms prevailing in California at the time of trial, norms that directed counsel in death penalty cases to conduct a reasonably thorough independent investigation of the defendant's social history—as agreed by respondent's own expert and as reflected in the American Bar Association standards relied upon by the court in the *Wiggins* case. Patterson also fell short of professional norms in his failure to proceed in a timely fashion with his investigation; this failure left him without recourse when his penalty phase strategy was upset by the refusal of petitioner and his wife to testify. Furthermore, defense counsel acted unreasonably in failing to conduct a thorough investigation of facts relating to petitioner's social history, considering the suggestive evidence in their possession, including a probation report and the statements of petitioner's sister, both of which should have alerted counsel to the need for further investigation. In addition, counsel's failure to pursue suggestive information in Dr. Vicary's report regarding petitioner's history also appears inconsistent with then existing standards, which emphasized the importance of uncovering evidence of childhood trauma.

█ We also examine the reasonableness of the investigation in light of defense counsel's actual strategy, as the *Wiggins* case directs us to do. As in *Wiggins*, it does not appear that counsel's failure to investigate was the result of a "reasoned strategic judgment." (*Wiggins, supra*, 539 U.S. at p. 526.) Patterson's strategy for the penalty phase appears to have been confused. The prime focus of the intended defense seems to have been petitioner's potential testimony regarding his difficulties with drug abuse, but that evidence already

had been presented to the jury during the guilt phase. Counsel apparently lacked any evidence to explain the *genesis* of petitioner's problems with drugs. Patterson testified at the reference hearing that he intended to demonstrate petitioner's humanity and problems with substance abuse to the jury, relying primarily upon the testimony of petitioner and his wife, but on the other hand it also appears that petitioner's wife made it clear from the beginning of the case that she did not want to testify on petitioner's behalf and that she also had rather damning things to say to counsel about petitioner.

Patterson's assertion that he intended to have petitioner inform the jury of his troubled childhood is surprising, because counsel seemed to have had little notion of the nature of the events that had occurred in petitioner's childhood and had not conducted an investigation sufficient to determine whether such testimony would invite damning rebuttal evidence. Patterson's testimony indicates that he had not rejected social history as an element of the case in mitigation, a circumstance rendering even more inexplicable his failure to thoroughly investigate petitioner's social history. At the same time, Patterson's testimony indicates he did not regard evidence of child abuse or alcoholism in the family as particularly mitigating—an apparently idiosyncratic view not commonly shared by contemporary capital defense attorneys. Finally, Patterson's investigation took place at a very late stage of the proceedings, and as noted above its combined tardiness and superficiality rendered Patterson unable to respond to the apparently unexpected failure of his penalty phase strategy.

 Patterson sought to explain his lack of investigation, stating his view that evidence concerning the abuse suffered by petitioner as a child would not make any difference or would not be helpful, because it would lead to the admission of evidence that petitioner had begun his criminal career as a small child—that he was a "career criminal." Counsel asserted that he made a tactical decision not to pursue this line of inquiry, but a tactical decision may be unreasonable if based upon inadequate investigation. (*In re Jones, supra,* 13 Cal.4th at pp. 564–565.) Counsel have an obligation to "pursue diligently those leads indicating the existence of evidence favorable to the defense." (*In re Neely* (1993) 6 Cal.4th 901, 919 [26 Cal.Rptr.2d 203, 864 P.2d 474].)

Although "[i]n some cases, counsel may reasonably decide not to put on mitigating evidence, . . . to make that decision counsel must understand what mitigating evidence is available and what aggravating evidence, if any, might be admissible in rebuttal." (*In re Marquez, supra,* 1 Cal.4th at p. 606.) As we stated in the *Marquez* case, in which we found counsel's cursory investigation of the defendant's background and family in Mexico to be constitutionally inadequate, a thorough investigation is the foundation for a sound trial

strategy. In that case we agreed with the referee, who rejected counsel's claim that he had curtailed investigation because "ominous signs" caused him to fear that further information could harm the defendant's case; we also agreed that "reasonably competent counsel would not have stopped at the first sign that an investigation might produce harmful evidence. [Reasonably competent] [c]ounsel would continue until counsel learned the nature and strength of that evidence and could weigh it against the mitigating evidence counsel had discovered." (*Id.* at pp. 605–606.) The evidence received at the reference hearing in the present case indicates that counsel did not have a clear or reasonably complete understanding of what mitigating evidence was available or what evidence might be admitted to rebut such mitigating evidence, and that counsel curtailed their investigation out of a vague fear that it might disclose damaging evidence. In so proceeding, counsel failed to perform in a reasonably competent manner.

In *In re Jackson* (1992) 3 Cal.4th 578 [11 Cal.Rptr.2d 531, 835 P.2d 371], we found counsel's investigation inadequate, when, after consultation with the defendant's father and his grandmother, counsel learned the defendant had had a difficult childhood and may have been abused, but decided to investigate no further because he feared any mitigating evidence would subject the defendant to aggravating rebuttal evidence of prior violent conduct. (*Id.* at pp. 610–612.) This approach, based upon such a vague fear, was in substance the one adopted by counsel in the present case.

The high court's decision in *Williams v. Taylor* (2000) 529 U.S. 362 [146 L.Ed.2d 389, 120 S.Ct. 1495] (*Williams*) confirms our view that counsel's tardy and incomplete investigation was constitutionally inadequate. In that case, the defendant confessed he had killed the victim with a mattock when the victim refused a loan of a few dollars. At the sentencing hearing in the defendant's capital trial, aggravating evidence indicated he had suffered prior convictions for armed robbery and burglary and had committed two violent assaults subsequent to the capital murder. In one, the defendant started a fire in a home and then attacked and robbed the elderly victim. In another, the defendant committed a brutal assault on an older woman who was left, as a consequence, in a "vegetative state." (*Id.* at p. 368.) In mitigation, counsel presented the testimony of the defendant's mother, two neighbors who stated defendant was not a violent person, and a psychiatrist who recounted the circumstances of defendant's confession and defendant's claim to have removed the bullets from his gun in order to avoid hurting a robbery victim. In closing argument, defense counsel stressed that the defendant had turned himself in.

Defense counsel's performance was constitutionally inadequate, the high court determined, because counsel failed to discover and present evidence

that the defendant had been subjected to abandonment and abuse as a child and that he was borderline mentally retarded. Defense counsel, like counsel in the present case, had been tardy in preparing for the sentencing phase of trial and, because of a misunderstanding of the law, "[t]hey failed to conduct an investigation that would have uncovered extensive records graphically describing [the defendant's] nightmarish childhood . . . . Had they done so, the jury would have learned that [the defendant's] parents had been imprisoned for the criminal neglect of [the defendant] and his siblings, that [the defendant] had been severely and repeatedly beaten by his father, that he had been committed to the custody of the social services bureau for two years . . . and then . . . returned to his parents' custody." (*Williams, supra,* 529 U.S. at p. 395, fn. omitted.)

The high court acknowledged that some of the additional evidence was not favorable. The defendant had been committed to juvenile institutions for such crimes as aiding and abetting larceny and breaking and entering. But "the failure to introduce the comparatively voluminous amount of evidence that did speak in [the defendant's] favor was not justified by a tactical decision to focus on [the defendant's] voluntary confession. Whether or not those omissions were sufficiently prejudicial to have affected the outcome of sentencing, they clearly demonstrate that trial counsel did not fulfill their obligation to conduct a thorough investigation of the defendant's background. See 1 ABA Standards for Criminal Justice 4-4.1, commentary, p. 4-55 (2d ed. 1980)." (*Williams, supra,* 529 U.S. at p. 396.)

As the court in *Williams, supra,* 529 U.S. 362 pointed out, longstanding professional standards direct that investigation into the background of persons charged with capital crimes ordinarily be undertaken, for the purpose of the penalty phase of trial. (*Id.* at p. 396.) Patterson's view that evidence of childhood abuse and institutionalization would be unhelpful seems to demonstrate a lack of appreciation of the purpose of the penalty proceedings. We have quoted with approval the comment of a federal court that " '[t]he major requirement of the penalty phase of a trial is that the sentence be individualized by focusing on the particularized characteristics of the individual. . . . [T]rial counsel failed to provide the jury with the information needed to properly focus on the particularized characteristics of this petitioner.' " (*In re Marquez, supra,* 1 Cal.4th at pp. 607–608, quoting *Armstrong v. Dugger* (11th Cir. 1987) 833 F.2d 1430, 1433.)

Although respondent points to defense counsel's asserted tactical decision that, in light of the brutality of the capital murders, there was little mitigating value in evidence that petitioner's stepfather had been an alcoholic or that as a child petitioner had been punished for bedwetting by being forced to stay under a bed for three days, it is evident that Patterson was not sufficiently

informed concerning the circumstances of petitioner's childhood to make the "tactical" determination that he did.[6]

In sum, we believe it would be as unreasonable to approve the superficial and tardy investigation into petitioner's social history that occurred in the present case as it would have been to accept the limited investigations conducted in *Wiggins, supra,* 539 U.S. 510; *Williams, supra,* 529 U.S. 362; *In re Jackson, supra,* 3 Cal.4th 578; or *In re Marquez, supra,* 1 Cal.4th 584. Counsel's failure to investigate adequately cannot be excused under contemporary professional standards, and indications in the material available to counsel that powerful mitigation evidence of childhood trauma could be uncovered made it all the more unreasonable to conduct such an incomplete investigation into petitioner's social history. Counsel's stated intention to elicit from petitioner, himself, evidence concerning his childhood provides no excuse for counsel's failure to investigate; indeed, it demonstrates the unreasonableness of counsel's failure to investigate.

Respondent objects that petitioner's asserted failure to cooperate with counsel excused counsel's failure to conduct any significant investigation of petitioner's background and social history. Respondent points out that in his first interview with Dr. Vicary, petitioner did not disclose that he had been abandoned and abused as a child. This nondisclosure did not constitute failure to cooperate, however, particularly in the absence of any indication that Dr. Vicary pressed petitioner to reveal such evidence. Counsel had other indications, including statements in the probation report and statements made by petitioner's sister Gwendolyn, that petitioner's childhood experiences had been unusually harsh. Petitioner did not direct counsel not to contact petitioner's relatives and friends, nor did he direct counsel not to investigate the circumstances of petitioner's childhood in Ohio. Furthermore, contemporary professional standards required counsel to conduct an adequate investigation of petitioner's background even if petitioner himself failed to come forward with evidence of his difficult history. It was counsel, not petitioner, who should have decided what information was relevant to the case in mitigation.

We reject respondent's assertion that petitioner's failure to inform defense counsel that he, petitioner, had been abused as a child constitutes a lack of cooperation excusing defense counsel's perfunctory investigation. As noted above, it was counsel's obligation to initiate investigation into petitioner's background. Further, the accused would not necessarily understand the significance of the information that would be uncovered by such an investigation. We observe that Patterson did not press petitioner to reveal information

---

[6] We do not find merit in petitioner's assertion that failure to investigate and present all reasonably available mitigating evidence constitutes ineffective assistance of counsel per se. Contrary to petitioner's claim, the high court continues to call for a case-by-case analysis applying the *Strickland* test. (*Williams, supra,* 529 U.S. at pp. 391, 395.)

concerning such matters as child abuse—indeed, he apparently viewed such information as having minimal use at the penalty phase.

Respondent also contends that Patterson's failure to investigate petitioner's background may be excused because petitioner lied to counsel and to investigator Lupori about his, petitioner's, involvement in the crimes. We fail to comprehend how this circumstance would excuse counsel from seeking to discover potential mitigating evidence for the purpose of the penalty phase of trial. Respondent also relies upon the failure of petitioner's mother to mention that she had abused her son and abandoned him—but she was hardly a likely source of such information, and in any event there were other indications of a history of abuse that should have put counsel on notice that further investigation was needed, including the 1974 probation report and the statements of petitioner's sister, Gwendolyn.

Respondent also asserts that counsel had a tactical reason not to inquire into petitioner's experience in juvenile facilities in Ohio. Respondent points to counsel's fear that evidence of juvenile offenses might cause the jury to view him as a "career criminal." But counsel did not gather enough information to make an informed assessment—Patterson did not know whether petitioner had been in a juvenile facility as a dependent and neglected child or as a criminal offender. The statement of petitioner's sister Gwendolyn that petitioner had been in and out of juvenile facilities from the age of seven years should have alerted counsel to the strong likelihood that petitioner had been sheltered as an abused and neglected child—a clear source of mitigating evidence. Nor did counsel possess sufficient information to make a reasonable determination whether evidence of petitioner's experience as a child would subject him to damaging rebuttal, or whether the weight of such mitigating evidence outweighed the potential for harmful rebuttal. Moreover, to the extent counsel relied upon petitioner to testify regarding mitigating circumstances in his background, counsel's strategy was imprudent in the absence of a more thorough investigation of that background.

Respondent contends that counsel's investigation was adequate in light of his strategy to demonstrate petitioner's "human face" and to stress that petitioner committed the crimes during a period of escalating drug abuse and intoxication. As respondent concedes, however, this strategy unraveled when counsel received the reports of his three experts and when petitioner and his wife refused to testify. Counsel had not investigated sufficiently to be able to formulate and mount an alternative case in mitigation. Further, additional investigation into petitioner's background would have been consistent with counsel's asserted penalty phase strategy, especially because it could have explained the genesis of petitioner's drug dependency. The background evidence of which counsel was aware should have suggested that further

investigation could produce evidence that would be strongly supportive of both strategies, without exposing petitioner to the dangers of cross-examination.

Respondent claims that counsel "did enough investigation of petitioner's past to know that petitioner's history of violent criminality extended throughout his life. He weighed the evidence of petitioner's juvenile history against the heinous nature of the crimes he was charged with, and made a strategic decision that the juvenile evidence was too trivial and remote, and tended to depict petitioner as a career criminal." If counsel believed that petitioner's history of violent criminality extended throughout his life, his belief was incorrect—petitioner's early experience in juvenile facilities was as an abused and neglected child of the age of seven years, not as a violent criminal. Counsel did not have sufficient information concerning the mitigating aspects of petitioner's juvenile history to weigh it against the aggravating circumstances of the capital murders and petitioner's record of criminal convictions, and thus did not investigate sufficiently to make an informed and reasonable tactical decision.

**E**

To establish prejudice, a "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland, supra,* 466 U.S. at p. 694.)

In the present case, copious, reliable evidence was readily available to show that petitioner had been abandoned as an infant and brutally rejected as a child, that he had been the focus of intense and cruel emotional and physical abuse during his formative years, that he had been rejected by his mother and relegated to the local juvenile social services agency by her when he was only seven years of age, that she and other members of the family failed to visit him with any frequency or regularity during his lengthy periods of out-of-home placement at a home for abused children that itself was marked by harsh conditions and abusive staff, and that at the age of 12 years he had been incarcerated for minor offenses and for status offenses (such as being incorrigible and being a runaway) in a high security prison that offered deplorable conditions and that housed the state's most serious and violent juvenile offenders. This mitigating evidence was weighty—particularly the evidence of the rejection and extraordinary abuse petitioner suffered at the hands of his family when he was a young child. (See, e.g., *In re Ross, supra,* 10 Cal.4th at p. 205; *In re Marquez, supra,* 1 Cal.4th at pp. 607–609.) Such evidence may be the basis for a jury's determination that a defendant's relative moral

culpability is less than would be suggested solely by reliance upon the crimes of which he stands convicted and the other aggravating evidence.

Had the jurors been provided with such evidence, they would not have been left to consider inexplicable acts of violence, but would have had some basis for understanding how it was that petitioner became the violent murderer he was shown to be at the guilt phase. There exists genuine pathos in the considerable evidence that petitioner was a person who was put up for adoption at birth and reclaimed after five foster home placements at the age of two and a half years, and that as a small child, petitioner was singled out for severe beatings by his mother, his stepfather, and his grandmother, humiliated by being excluded from family meals, fed and clothed inadequately, subjected to bizarre discipline, and finally rejected and excluded from the family altogether and relinquished to the questionable care of state institutions for neglected children at the age of seven years. Such evidence naturally would have given rise to greater understanding, if not also to sympathy. In the words of Dr. Fink (the psychologist who treated petitioner as a child), laypersons long have understood, without relying upon psychological theory, that "as the twig is bent, so grows the tree."

We recognize the aggravated nature of the crimes, namely, the brutal and calculating attack on two frail, helpless elderly neighbors who could not have resisted the burglary and theft committed by petitioner, his flight, and his unsuccessful attempt to excuse himself with claims that he had been in a dream state. The circumstances of the crimes and of petitioner's prior attack on the young babysitter demonstrate deep moral culpability.

In addition, we acknowledge that there was a potential for the admission of powerful rebuttal evidence if testimony concerning petitioner's good character had been introduced, possibly opening the door to the introduction of evidence of petitioner's record of repeated juvenile offenses, poor behavior in juvenile facilities, and "revolving door" incarcerations. Evidence of petitioner's good relationships with various family members and friends, as well as his reputation as a good family man who loved his wife and children, could have been rebutted with evidence that he had struck his wife on two occasions during disputes, that he stole her welfare checks in order to purchase drugs, and that this conduct on his part was consistent with a lifetime pattern of taking what he wanted, lack of conscience, and violence when crossed. Good character evidence also potentially could have led to the discovery of adult robbery and escape convictions of which the prosecution had been unaware. A jury might have relied upon these acts as constituting a basis for deciding that society should be guaranteed protection against petitioner, especially in light of the evidence establishing that from his early childhood on, petitioner habitually ran away from home and escaped from

juvenile placements. If petitioner had produced evidence that various juvenile institutions had failed to provide adequate services to him, the prosecution could have countered with evidence that from the time of his early childhood, efforts had been made to provide petitioner with therapy, but that he could not be helped and did not change—indeed, that he suffered from antisocial personality disorder or had been diagnosed as a psychopath at an early age and ultimately was considered untreatable.

Respondent has offered no theory, however, under which the compelling and disturbing evidence that petitioner was abandoned in infancy and, after being reclaimed, was beaten and subjected to grotesque abuse by his mother, stepfather, and grandmother in early childhood, legitimately could have opened the door to damaging rebuttal evidence. "[T]he scope of rebuttal must be specific, and evidence presented or argued as rebuttal must relate directly to a particular incident or character trait defendant offers in his own behalf." (*People v. Rodriguez* (1986) 42 Cal.3d 730, 792, fn. 24 [230 Cal.Rptr. 667, 726 P.2d 113].) Evidence that a defendant suffered abuse in childhood generally does not open the door to evidence of defendant's prior crimes or other misconduct. (*In re Jackson, supra,* 3 Cal.4th at pp. 613–614; *People v. Ramirez* (1990) 50 Cal.3d 1158, 1191–1193 [270 Cal.Rptr. 286, 791 P.2d 965].) We do not believe that evidence of specific acts of abuse inflicted on petitioner in early childhood would permit rebuttal with evidence of his subsequent misconduct or his psychiatric diagnosis in later childhood. And evidence and argument intended to demonstrate that petitioner *justifiably* was abused in the manner he was, because he was a bad boy at the age of five or six years, would be unlikely to carry much weight in the prosecution's favor with the jury.

The United States Supreme Court in *Wiggins* described the process of assessing prejudice as follows: "In assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence." (*Wiggins, supra,* 539 U.S. at p. 534.) In *Wiggins,* the high court determined that counsel's failure to perform an adequate investigation into potential evidence in mitigation was prejudicial in light of the available evidence of privation and abuse suffered by the petitioner during his first six years of life, gross abuse he suffered in later foster care and juvenile incarcerations, and his homelessness and reduced mental capacity. The court declared that this was "the kind of troubled history we have declared relevant to assessing a defendant's moral culpability" (*Id.* at p. 535), and added the observation that persons in our society believe that " ' "defendants who commit criminal acts that are attributable to a disadvantaged background . . . may be less culpable than defendants who have no such excuse." ' " (*Ibid.*) The high court also found that, evaluating "the totality of the evidence—'both that adduced at trial, and the evidence adduced in the habeas proceeding[s]' " (*id.* at p. 536, italics omitted), there was a reasonable probability that the jury would have

reached a different verdict had it been aware of the mitigating evidence, "[g]iven both the nature and the extent of the abuse petitioner suffered . . . ." (*Id.* at p. 535.) The court explained that although it may have been "strategically defensible" for counsel to emphasize evidence that the petitioner did not kill the victim with his own hand, such a strategy could have been combined with a strategy of demonstrating the abuse that the petitioner had suffered in his youth. (*Ibid.*) The jury was aware of only one factor in mitigation—that Wiggins did not have any prior convictions. "Had the jury been able to place petitioner's excruciating life history on the mitigation side of the scale, there is a reasonable probability that at least one juror would have struck a different balance." (*Id.* at p. 537.)

On balance, we believe the same result should obtain in the present case. Our review of the record indicates that the quality of the readily available mitigating evidence relating to childhood abandonment and abuse was high and that its nature was forceful. In support of the conclusion that counsel's omissions were prejudicial, we turn again to the high court's decision in *Williams, supra,* 529 U.S. 362. There, the court found to be prejudicial trial counsel's failure to investigate and present evidence regarding the defendant's dire experience of abuse as a child, even in light of evidence of the defendant's multiple prior violent crimes against vulnerable victims, and even though counsel did present some mitigating evidence. Although in that case the prosecution presented evidence in aggravation that strongly suggested that the defendant would present a serious risk of future violent crime, "the graphic description of [the defendant's] childhood, filled with abuse and privation, or the reality that he was 'borderline mentally retarded,' might well have influenced the jury's appraisal of his moral culpability. [Citation.] . . . . Mitigating evidence unrelated to dangerousness may alter the jury's selection of penalty, even if it does not undermine or rebut the prosecution's death-eligibility case." (*Id.* at p. 398.) The same considerations support a conclusion that counsel's omissions in the present case were prejudicial.

We also are assisted in assessing prejudice by comparing this case to *In re Marquez, supra,* 1 Cal.4th 584, in which we granted relief based upon counsel's failure to investigate and present evidence in mitigation at the penalty phase of trial. Counsel contacted the defendant's parents and sisters, but did not investigate his character and background for the purpose of presenting evidence in mitigation at the penalty phase. The only mitigating evidence offered to the jury was brief guilt phase testimony describing the poverty of the Mexican village in which Marquez was raised. We found prejudice in the circumstance that substantial mitigating evidence, not cumulative to any evidence received at the guilt phase, was available and would have afforded the jury a view of petitioner's childhood and adolescence in Mexico, his positive qualities, and the affectionate regard in which he was held by friends and relatives.

In *Marquez* we characterized the aggravating evidence as relatively spare. Although the defendant stood convicted of first and second degree murders in incidents two years apart, as well as burglary and robbery, there was no proof of prior convictions or uncharged crimes. We concluded that it was reasonably probable a jury would believe life in prison without possibility of parole was a sufficient punishment. We said: "We cannot put confidence in the verdict of a jury that decided the case without hearing the substantial mitigating evidence that competent counsel could and should have presented." (*In re Marquez, supra,* 1 Cal.4th at p. 609.)

Although the aggravating evidence in the present case cannot be called spare, given the brutality of the charged offenses, the vulnerability of the victims, and the existence of a prior violent assault, petitioner has submitted mitigating evidence in multiple categories: childhood hardship and abuse, early institutionalization, and positive human qualities. The readily available mitigating evidence of childhood abandonment and abuse undeniably is particularly significant. As noted, the United States Supreme Court has recognized that evidence of matters such as turbulent family background and childhood abuse is of particular relevance to a jury's consideration of whether to impose the death penalty. (See, e.g., *Wiggins, supra,* 539 U.S. at p. 535; *Eddings v. Oklahoma* (1982) 455 U.S. 104, 107, 109–113 [71 L.Ed.2d 1, 102 S.Ct. 869]; see also *Burger v. Kemp* (1987) 483 U.S. 776, 789, fn. 7 [97 L.Ed.2d 638, 107 S.Ct. 3114], and cases cited.)

We must inquire whether there is a reasonable probability—defined as a probability "sufficient to undermine confidence in the outcome" (*Strickland, supra,* 466 U.S. at p. 694)—that the evidence of petitioner's childhood of deprivation and abuse would have produced a different verdict. We believe such a reasonable probability exists. A significant potential exists that this evidence would produce sympathy and compassion in members of the jury and lead one or more to a more merciful decision. The potential that the evidence would reduce petitioner's moral culpability in the eyes of members of the jury also is significant, even weighed against potential rebuttal evidence. We conclude that petitioner has carried his burden of establishing that there is a reasonable probability that the verdict would have been different had counsel presented the evidence that would have been developed by a reasonably competent investigation into petitioner's background.

Respondent objects that prejudice has not been established, because defense counsel would not have presented the evidence concerning petitioner's background that was disclosed during the habeas corpus proceeding. Respondent points out that Patterson asserted that once petitioner and his wife decided not to testify, Patterson made a strategic choice that it would be best not to present any evidence in mitigation. A similar claim was rejected as

unpersuasive in *Wiggins, supra,* 539 U.S. 510, because defense counsel's strategy at the penalty phase was unreasonable in light of counsel's ignorance of the potential evidence in mitigation. As the high court stated, "counsel were not in a position to make a reasonable strategic choice as to whether to focus on Wiggins' direct responsibility, the sordid details of his life history, or both, because the investigation supporting their choice was unreasonable." (*Id.* at p. 536.) Here, as in *Wiggins,* it is evident that defense counsel had *not* determined that evidence of petitioner's childhood should be excluded *entirely.* Patterson stated that he intended to have petitioner himself testify regarding such matters. Nor does petitioner's concurrence in counsel's "strategic" decision not to present evidence at the penalty phase change our conclusion with respect to prejudice, in light of counsel's failure to conduct a reasonably adequate investigation in advance of settling upon a strategy and advising their client of that strategy.

## IV

For the foregoing reasons, we conclude that, although petitioner has failed to establish juror misconduct that would warrant setting aside the verdicts rendered at the guilt phase of the proceedings, the evidence presented at the reference hearing demonstrates, as claimed by petitioner, that his trial counsel's failure to perform an adequate investigation of available evidence in mitigation for possible use at the penalty phase constitutes performance that falls below an objective standard of reasonableness. This failure was prejudicial. Accordingly, we grant the petition with respect to the latter claim.[7]

Our order to show cause was limited to the issues discussed in this opinion, and petitioner's other claims will be resolved by separate order, as is our practice. (See *In re Scott, supra,* 29 Cal.4th 783.)

---

[7] *Respondent complains that the referee abused his discretion by denying counsel for* respondent informal access to petitioner's trial counsel prior to the reference hearing even though respondent already had discussed the case with them and had secured declarations from them. We do not reach the issue of the referee's asserted abuse of discretion because, even assuming an abuse of discretion, respondent has failed to establish prejudice.

## DISPOSITION

The petition for writ of habeas corpus is granted insofar as it is based upon counsel's constitutionally inadequate representation of petitioner at the penalty phase of the trial, and the judgment of the Los Angeles County Superior Court in *People v. Larry Douglas Lucas*, No. A-471259, therefore is vacated insofar as it imposes a sentence of death. Upon finality of our opinion, the Clerk of the Supreme Court shall remit a certified copy of the opinion and order to the Los Angeles County Superior Court for filing, and respondent Attorney General shall serve another copy thereof on the prosecuting attorney in conformity with Penal Code section 1382, subdivision (a)(2). (See *In re Jones, supra*, 13 Cal.4th at p. 588.)

Kennard, J., Baxter, J., Werdegar, J., Chin, J., Brown, J., and Moreno, J., concurred.