Filed 4/30/13  P. v. Hatcher CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B238472 |
| Plaintiff and Respondent, | (Los Angeles County |
| v. | Super. Ct. No. MA041521) |
| BRIAN HATCHER, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Lisa Mangay Chung, Judge.  Affirmed with directions.

John Steinberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Victoria B. Wilson and Chung L. Mar, Deputy Attorneys General, for Plaintiff and Respondent.

## I. INTRODUCTION

On March 18, 2007, defendant, Brian Hatcher, shot and killed Derel Smith. The two men had a history of feuding and defendant had previously threatened to shoot Mr. Smith. An eyewitness identified defendant as the assailant. Defendant admitted shooting Mr. Smith but claimed he acted in self-defense. The jury convicted defendant of first degree murder by intentionally discharging a firearm from a motor vehicle with the intent to inflict death. (Pen. Code,[1] §§ 187, subd. (a), 189, 190.2, subd. (a)(21).) Defendant was sentenced to life without the possibility of parole with a consecutive 25-years-to-life term. We affirm the judgment.

## II. DISCUSSION

### A. The Suppression Motion

The murder weapon was found in the attic of a home on Still Meadow Lane in Lancaster. In a pretrial motion under Evidence Code section 1538.5, defendant moved to suppress the firearm. The trial court found defendant had no reasonable expectation of privacy in the place searched; therefore, he could not object to the seizure. We conclude the trial court properly denied the suppression motion.

We evaluate defendant's search and seizure challenge under the Fourth Amendment to the United States Constitution. (*People v. Carter* (2005) 36 Cal.4th 1114, 1141; *People v. McPeters* (1992) 2 Cal.4th 1148, 1171, abrogated on another point as stated in *People v. Clark* (2011) 52 Cal.4th 856, 939.) The warrantless entry into the Still Meadow Lane house was presumptively unconstitutional. (*Welsh v. Wisconsin* (1984) 466 U.S. 740, 748-749; *People v. Ledesma* (1987) 43 Cal.3d 171, 232; *People v. Magee*

---

[1]    All further statutory references are to the Penal Code except where otherwise noted.

(2011) 194 Cal.App.4th 178, 183.)  However, defendant may object to the warrantless entry only if he had a constitutionally protected reasonable expectation of privacy in the particular area searched or the thing seized.  (*United States v. Salvucci* (1980) 448 U.S. 83, 91-92; *People v. Carter, supra,* 36 Cal.4th at p. 1141; *People v. Jenkins* (2000) 22 Cal.4th 900, 972.)  "'The legitimate expectation of privacy must exist in the *particular area searched or thing seized* in order to bring a Fourth Amendment challenge.' [Citation.]" (*People v. McPeters, supra,* 2 Cal.4th at p. 1171.)

Defendant had the burden of establishing he had a reasonable expectation of privacy in the attic at the time of the warrantless entry.  (*Rawlings v. Kentucky* (1980) 448 U.S. 98, 104-105; *People v. Carter, supra,* 36 Cal.4th at p. 1141; *People v. Jenkins, supra,* 22 Cal.4th at p. 972.)  "Among the factors to be considered are ""whether the defendant has a [property or] possessory interest in the thing seized or the place searched; whether he has the right to exclude others from that place; whether he has exhibited a subjective expectation that it would remain free from governmental invasion, whether he took normal precautions to maintain his privacy and whether he was legitimately on the premises.""" (*People v. Hernandez* (1988) 199 Cal.App.3d 1182, 1189.)" (*People v. Roybal* (1998) 19 Cal.4th 481, 507; accord, *People v. McPeters, supra,* 2 Cal.4th at p. 1172.)

"In reviewing the trial court's denial of a motion to suppress evidence, we view the record in the light most favorable to the trial court's ruling, deferring to those express or implied findings of fact supported by substantial evidence.  [Citations.]  We independently review the trial court's application of the law to the facts.  [Citation.]" (*People v. Jenkins, supra,* 22 Cal.4th at p. 969; accord, *People v. Carter, supra,* 36 Cal.4th at p. 1140.)

We conclude the trial court properly denied defendant's suppression motion as he had no reasonable expectation of privacy in the attic of the Still Meadow Lane home.  The evidence presented at the suppression hearing was as follows.  Tianna Turner gave defendant permission to stay at the residence.  Several other people also stayed in the home on a regular basis.  Defendant did not sleep in the home every night, but had stayed

3

there off and on for several months.  He had a key to the front door.  He had a key to his bedroom door, which he kept locked.  He had moved possessions into the bedroom.  When he was arrested, however, defendant listed his parents' address, not the Still Meadow Lane house, as his residence.

When police officers entered the home, they found the downstairs rooms empty of furniture.  There was a small amount of furniture and a mattress in an upstairs bedroom, together with an envelope bearing defendant's name.

Defendant had not signed a rental agreement.  Defendant testified he agreed to provide food and maintenance in lieu of rent.  Ms. Turner had signed an agreement to lease the home, but had not paid the rent.  The owner was in the process of evicting her.  An eviction notice had been posted on the door of the residence.

The attic in which the firearm was found was not locked.  There was no evidence defendant had specific permission to enter the attic or to store his firearm there.  There was no evidence defendant had the ability to prevent others from entering the attic.  There was no evidence he attempted to control or safeguard the attic after he placed his gun there.  Under all of the foregoing circumstances, defendant had no reasonable expectation of privacy in the attic of the Still Meadow Lane home.  (See *People v. Jenkins, supra,* 22 Cal.4th at p. 972; *People v. McPeters, supra,* 2 Cal.4th at p. 1172; *People v. Hernandez, supra,* 199 Cal.App.3d at pp. 1188-1190.)  The trial court properly denied the suppression motion.

## B.  Confidential Juror Information

Defendant filed a post-verdict petition for release of confidential juror information under Code of Civil Procedure section 237.  Defendant sought to investigate alleged jury misconduct.  Defense counsel's supporting declaration stated that according to a female juror, a male juror had discussed his personal experience with gangs during

4

deliberations.[2]  The trial court properly declined to consider evidence of how the male juror's comments affected other jurors' decisions.  (Evid. Code, § 1150, subd. (a); *People v. Williams* (2006) 40 Cal.4th 287, 333.)  The trial court summarily denied defendant's petition.  As discussed below, defendant did not meet his threshold burden of showing good cause for a hearing.  Therefore, we find no abuse of discretion.

Pursuant to Code of Civil Procedure section 237, subdivision (b):  "Any person may petition the court for access to [personal juror identifying information] records.  The petition shall be supported by a declaration that includes facts sufficient to establish *good cause* for the release of the juror's personal identifying information. . . ."[3]  (Italics added.)

---

[2]  Defense counsel, Angelyn Gates, declared that post-trial she had contacted a female juror who agreed to speak with Ms. Gates, and:  "[The juror] made a comment about another male juror who really helped because he had information that the other jurors did not.  . . .  [¶]  . . .  According to the female juror, the male juror informed the other jurors that he had personal knowledge of gang related behavior, how gangs act, what they do and don't do, what their families do and don't do, and similar information because he himself had been around gangs growing up and was, at one time, in a gang.  The female juror told me that this male juror used his own personal experiences and knowledge of how people like [defendant] and the other young people involved in the case would have done things and that this information was used by the male juror to convince other jurors to adopt his views and opinions.  [¶]  . . .  The female juror gave me an example of this as follows:  The female juror was expressing her thoughts regarding why [defendant] would drive up to the alleged victim in the day time with a rifle to shoot him at close range as opposed to doing it from a distance where he would not be so easily seen.  (This effects [*sic*] premeditation and intent.)  The male juror told the female and other jurors that, based upon his personal knowledge of these types of matters, 'that is not the way it is done' and that in these types of situations, the shooter, [defendant], would have made sure that the alleged victim 'knew who it was that was killing him.'  This information was something that the female juror took as accurate based upon the male juror's personal experiences and knowledge of how shootings are done on the streets with people like [defendant].  The way the female juror explained the situation, it seemed clear that she was affected by the knowledge of the male juror and took that into consideration in her deliberations."

[3]  Code of Civil Procedure section 237, subdivision (b) states in full:  "Any person may petition the court for access to [personal juror identifying information] records.  The petition shall be supported by a declaration that includes facts sufficient to establish good cause for the release of the juror's personal identifying information.  The court shall set

Absent a showing of jury misconduct, there is no prima facie good cause for disclosure of juror information. (*People v. Carrasco* (2008) 163 Cal.App.4th 978, 991; *People v. Jefflo* (1998) 63 Cal.App.4th 1314, 1322.) Our review is for an abuse of discretion. (*People v. Carrasco, supra,* 163 Cal.App.4th at p. 991; *People v. Santos* (2007) 147 Cal.App.4th 965, 978; see *People v. Carter* (2003) 30 Cal.4th 1166, 1216; *Townsel v. Superior Court* (1999) 20 Cal.4th 1084, 1097-1098.)

Defendant makes two arguments on appeal. First, the male juror concealed bias during voir dire questioning. Second, the juror introduced outside information during deliberations that influenced other jurors.

With respect to defendant's first argument, a potential juror's intentional concealment of material information may constitute implied bias justifying disqualification or removal. (*People v. Wilson* (2008) 44 Cal.4th 758, 823; *People v. Tuggles* (2009) 179 Cal.App.4th 339, 371.) "[T]he initial burden is on defendant to prove the misconduct." (*In re Carpenter* (1995) 9 Cal.4th 634, 657; see *People v. Granish* (1996) 41 Cal.App.4th 1117, 1131-1132.) Here, defendant made no showing whatsoever in the trial court that the juror concealed relevant facts or gave false answers during voir dire examination. (See *People v. Wilson, supra,* 44 Cal.4th at p. 823; *In re Hitchings* (1993) 6 Cal.4th 97, 111-112; *People v. Tuggles, supra,* 179 Cal.App.4th at pp. 371-374.) Defendant offered no evidence or discussion of the voir dire examination of the male juror. Defendant makes no showing of juror misconduct during voir dire on appeal. As a result, we need not address the contention further.

---

the matter for hearing if the petition and supporting declaration establish a prima facie showing of good cause for the release of the personal juror identifying information, but shall not set the matter for hearing if there is a showing on the record of facts that establish a compelling interest against disclosure. A compelling interest includes, but is not limited to, protecting jurors from threats or danger of physical harm. If the court does not set the matter for hearing, the court shall by minute order set forth the reasons and make express findings either of a lack of a prima facie showing of good cause or the presence of a compelling interest against disclosure."

6

As to defendant's second argument, he has not shown the male juror brought improper information to bear on the deliberation process. "A juror may commit misconduct by receiving or proffering to other jurors information about the case that was not received in evidence at trial. [Citation.]" (*In re Lucas* (2004) 33 Cal.4th 682, 696.) "A juror . . . should not discuss an opinion explicitly based on specialized information obtained from outside sources. Such injection of external information in the form of a juror's own claim to expertise or specialized knowledge of a matter at issue is misconduct. [Citations.]" (*In re Malone* (1996) 12 Cal.4th 935, 963; accord, *People v. San Nicolas* (2005) 34 Cal.4th 614, 649.) "Jurors may not present as facts specialized knowledge they claim to possess. (*People v. Allen and Johnson* (2011) 53 Cal.4th 60, 76.) "[But,] [j]*urors' views of the evidence . . . are necessarily informed by their life experiences, . . . .* [¶] 'Jurors bring to their deliberations knowledge and beliefs about general matters of law and fact that find their source in everyday life and experience.' [Citation.] This experience may stem from education or employment, but sometimes it comes from other personal experiences. . . . '[J]urors cannot be expected to shed their backgrounds and experiences at the door of the deliberation room.' [Citations.] Rather, 'jurors are expected to bring their individual backgrounds and experiences to bear on the deliberative process.' [Citation.]" (*In re Lucas, supra,* 33 Cal.4th at p. 696; accord, *People v. Allen and Johnson, supra,* 53 Cal.4th at pp. 76-78 [juror's opinion about reliability of Hispanics in the workplace was an application of his life experience, not misconduct]; *People v. San Nicolas, supra,* 34 Cal.4th at pp. 649-650 [it was not misconduct for a juror who was a nurse to explain blood flow and circulation where her assertions were consistent with the evidence]; *People v. Yeoman* (2003) 31 Cal.4th 93, 162 [no misconduct where jurors recounted personal experiences with drugs]; *People v. Steele* (2002) 27 Cal.4th 1230, 1265-1267 [jurors' views based on experience in the military and in Vietnam were permissible interpretations of the evidence]; *People v. Fauber* (1992) 2 Cal.4th 792, 838-839 [no prejudicial misconduct where juror commented on drug use as affecting witness credibility].)

It is not misconduct when a juror merely applies his or her life experiences in evaluating and interpreting the evidence. In *People v. Allen and Johnson, supra,* 53 Cal.4th at pages 76-78, for example, a witness claimed to have been an eyewitness to a shooting. Other evidence indicated the witness was not present at the time of the shooting; rather, he was at work. (*Id.* at p. 77.) The witness testified a friend sometimes punched in for him at work. (*Id.* at p. 66.) One juror did not believe that testimony. During deliberations the juror said, "'That's a lie. I know Hispanics, they never cheat on timecards, so this witness . . . was at work, end of discussion.'" (*Id.* at p. 66, fn. omitted.) Our Supreme Court noted that the juror did not ignore or substitute his own beliefs for the trial court's instructions. (*Id.* at p. 77.) Moreover, the court held, there was no juror misconduct: "[The juror's] positive opinion about the reliability of Hispanics in the work place did not involve specialized information from an outside source. It was an application of his life experience, in the specific context of timecards and the workplace, that led him to conclude [the purported eyewitness] was not telling the truth about the shootings. [The juror] simply found unconvincing [the purported eyewitness's] excuse as to why his timecard indicated he was elsewhere. [Citation.] [¶] . . . [The juror] drew on his own personal life experience to conclude this witness lacked credibility because of the explanation he gave for a critical discrepancy. [¶] . . . [¶] [The juror's] timecard remark did not introduce unproven facts into the case." (*Id.* at p. 78.)

Similarly, in *People v. San Nicolas, supra,* 34 Cal.4th at page 648, "a major point of dispute during deliberations was whether [the victim] was dead at the time [she was] rape[d]." A juror who was a nurse explained certain medical issues relating to blood pressure and circulation. The defendant sought a new trial on juror misconduct grounds. The trial court denied the motion. Our Supreme Court found no abuse of discretion: "[T]he evidence presented in support of defendant's motion for a new trial does not show that [the juror] offered the jurors any basis for deciding the case other than the evidence and testimony presented at trial. . . . Indeed, the remarks attributed to her . . . are consistent with the trial testimony of the pathologist . . . . The trial court did not abuse its

8

discretion in ruling that [the juror's] explanation of blood evidence was not misconduct." (*Id.* at p. 650.)

Here, according to the female juror who spoke with defense counsel, the male juror brought into the deliberation process his personal experience with gangs. There was evidence the victim was associated with a gang. But there was no allegation defendant was a gang member or that he committed the present crime for the benefit of a gang. (See § 186.22.) No expert testimony was offered concerning gangs. The male juror brought only his individual experience to bear on the deliberation process. He did not rely on specialized information from an outside source. Defendant has not shown that the juror's personal experience with gangs was contrary to the evidence or to the applicable law. The juror's reported comment about why defendant shot the victim at close range was merely an application of his life experience to the evidence. There was no prima facie showing of juror misconduct and no good cause to disclose juror information. The trial court did not abuse its discretion in summarily denying defendant's motion.

Even if the juror's comments had constituted misconduct, there was no prejudice. "When misconduct is found, there is a presumption of prejudice that """"may be rebutted . . . by a reviewing court's examination of the entire record to determine whether there is a reasonable probability of actual harm to the complaining party [resulting from the misconduct.] . . . .""""" [Citation.]" (*People v. Williams, supra,* 40 Cal.4th at p. 333; accord, *People v. Loker* (2008) 44 Cal.4th 691, 749.) Here, it was undisputed defendant shot the victim at close range. *Why* he did so was not a material issue. The dispositive question before the jury was whether defendant acted in self-defense. There is no reasonable probability of actual harm to defendant.

9

## C. Prosecutorial Misconduct

Defendant asserts the prosecutor engaged in a pattern of misconduct throughout the trial in violation of defendant's due process rights. Defendant contends the prosecutor's misconduct "constituted the use of reprehensible means of obtaining a conviction . . . ." Defendant points to four occasions on which the prosecutor allegedly engaged in misconduct; specifically, the prosecutor: questioned defendant about witness intimidation without any factual basis; intentionally elicited inadmissible testimony a neighbor saw defendant in possession of a 9-millimeter Glock firearm; improperly attempted to shift the burden of proof to the defense during closing argument by questioning why certain named witnesses never testified for the defense; and misstated the law of imperfect self-defense during closing argument.

The federal and state standards governing prosecutorial misconduct are as follows: """"A prosecutor's . . . intemperate behavior violates the federal Constitution when it comprises a pattern of conduct "so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process."""" [Citations.] Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves """"the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury."""" [Citations.]" (*People v. Hill* (1998) 17 Cal.4th 800, 819; accord, *People v. Vines* (2011) 51 Cal.4th 830, 873.) Failure to object to the challenged conduct or to request a curative admonition bars presentation of a prosecutorial misconduct claim on appeal. (*People v. Stewart* (2004) 33 Cal.4th 425, 484; *People v. Farnam* (2002) 28 Cal.4th 107, 167.) "'A defendant's conviction will not be reversed for prosecutorial misconduct' that violates state law . . . 'unless it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct.' (*People v. Crew* (2003) 31 Cal.4th 822, 839.)" (*People v. Wallace* (2008) 44 Cal.4th 1032, 1071.) We find no prosecutorial misconduct.

## 1. The Witness Intimidation Question

"A prosecutor commits misconduct by intentionally eliciting inadmissible testimony. (*People v. Smithey* (1999) 20 Cal.4th 936, 960.)" (*People v. Abel* (2012) 53 Cal.4th 891, 925.) As noted above, defendant asserts the prosecutor questioned defendant about witness intimidation without any factual basis. We conclude there was a factual basis for the prosecutor's questions. Hence, there was no misconduct.

While in county jail custody, in his telephone and in-person communications, defendant directed others to contact potential witnesses and make sure they would not implicate him. During a recorded visit with Travell Black, defendant said, "[The] only person I fuck with . . . is Brian Thomas." Mr. Thomas testified at trial that he had been threatened by the Long Range Pimps, a party group. Defendant was a member of the Long Range Pimps. In November 2010, Mr. Thomas received a message from the Long Range Pimps through his girlfriend. The message was, "Just that I better not testify or [I'll] end up like . . . [Derel]." And, around the same time, someone put a bullet hole in his mother's house.

The prosecutor asked defendant the following questions on cross-examination: "Q By [Deputy District Attorney Ani] Bailey: Did the Long Range Pimps also engage in intimidating witnesses like they did to Brian Thomas back in November of 2010? [¶] [Angelyn] Gates [for defendant]: Objection. [¶] The Witness: No. [¶] The Court: Overruled. [¶] Q By Ms. Bailey: The Long Range Pimps didn't go to Brian Thomas's mother's house and put a bullet through there? [¶] A. No. [¶] Q. Okay. Did you direct the Long Range Pimps to intimidate Brian Thomas back in November of 2010: [¶] A. Never. [¶] Q. Did you tell the Long Range Pimps to go look for Brian and to threaten him that if he testified, he'd end up like [Derel]? [¶] A. Never."

There was a factual basis for the prosecutor's questions. There was evidence defendant attempted to influence witness testimony. In addition, defendant said he had "fuck[ed]" with Mr. Thomas. Defendant's party group had threatened Mr. Thomas. The

11

prosecutor could reasonably conclude defendant was behind the threat. There was no prosecutorial misconduct.

## 2. The Neighbor's Observations

The trial court held a hearing on the admissibility of a video recording of a party at the Still Meadow Lane residence. The video recording depicted two individuals with guns. The trial court cautioned the prosecutor not to *argue* that either individual was defendant. Defendant asserts that notwithstanding the trial court's ruling, the prosecutor intentionally elicited inadmissible testimony concerning defendant's possession of a Glock firearm. ""'It is . . . misconduct for a prosecutor to 'intentionally elicit inadmissible testimony.' [Citations.]" [Citation.] . . . However, a prosecutor cannot be faulted for a witness's nonresponsive answer that the prosecutor neither solicited nor could have anticipated. [Citation.]" (*People v. Tully* (2012) 54 Cal.4th 952, 1035.) Here, the prosecutor did not anticipate the challenged testimony.

The challenged testimony was as follows. Moises Briones lived next door to the Still Meadow Lane house in Lancaster. Mr. Briones had observed a large number of parties held on the neighboring property. He had seen people drinking, using drugs and displaying weapons. Mr. Briones recognized defendant from the neighboring house.

When Ms. Bailey, the prosecutor, asked *how* Mr. Briones recognized defendant, the following ensued: "A. I saw him on – with a weapon and on a motorcycle. [¶] Q And what day was that? Do you remember? [¶] A That was . . . [¶] Q Well, when you saw him with the weapon, what kind of weapon was it? [¶] A I am going to say probably a nine [millimeter] Glock maybe. [¶] Q What day was that? [¶] A March 17. [¶] Ms. Gates: You honor, I am going to object. Ask for a sidebar."

At sidebar, defense counsel argued evidence defendant had been in possession of a Glock firearm was inadmissible criminal propensity evidence. Ms. Bailey stated, "I had no idea this testimony was going to come out at all." Ms. Bailey had expected Mr. Briones to say he had seen defendant with a rifle. That testimony would have been

12

consistent with defendant's use of a rifle to shoot the victim. The trial court ruled there was no discovery violation; in earlier interviews and testimony, the witness had never mentioned a nine millimeter Glock; hence the testimony was not expected. The trial court struck the testimony and admonished the jury to disregard it. Defendant has not shown that the prosecutor intentionally elicited inadmissible testimony. (See *People v. Tully, supra,* 54 Cal.4th at pp. 1035, 1040; *People v. Valdez* (2004) 32 Cal.4th 73, 125.)

Even if we were convinced the prosecutor committed misconduct, it is not reasonably probable the result would have been more favorable to defendant absent the misconduct. (See *People v. Arias* (1996) 13 Cal.4th 92, 161 [no reversal for prosecutorial misconduct absent prejudice]; *People v. Stansbury* (1993) 4 Cal.4th 1017, 1057, revd. on other grounds in *Stansbury v. California* (1994) 511 U.S. 318, 325-327 [same].) The jury was admonished to disregard the testimony. Moreover, the jury was fully aware defendant had possessed weapons. Defendant testified at trial he had possessed firearms in the past and had been arrested for firearm possession. And during a recorded in-custody telephone conversation with Cheyana Garcia, defendant said, "I got to stop carrying pistols, man, because that shit going to be hard." In another recorded in-custody telephone conversation, this time with Kristen Gallion, defendant commented, "When I get out, I got to get square. No fighting. No guns and that kind of stuff I can't carry none of that no more." Defendant further commented that he used to "have guns under the seat . . . ." The witness's brief mention of the Glock firearm could not have prejudiced defendant.

### 3. The Burden of Proof Argument

Defendant's third prosecutorial misconduct claim is that the prosecutor, Deputy District Attorney Samantha Sadinsky,[4] improperly attempted to shift the burden of proof

---

[4]    The People were represented by Ms. Bailey and Ms. Sadinsky.

to the defense during closing argument by questioning why certain named witnesses never testified for the defense.  The prosecutor commented on the absence of particular witnesses to corroborate defendant's version of the events.[5]  "[A] prosecutor may argue

**5**      The prosecutor argued as follows:  "Let's talk about why [defendant] didn't call certain witnesses.  [¶] . . . [¶] . . . And he doesn't have to put on a defense, but he did.  So why not put on a full defense?  Why not call all of the witnesses that could reasonably tell us why he acted in self-defense.  [¶]  The first person is Becca.  [During jailhouse conversations with others, defendant said Becca knew what had happened.]  And, again, there is no reasonable explanation.  He has not been able to explain why . . . [¶] . . . He cannot explain why he says Becca is there.  There is no reasonable explanation for this statement by the defendant.  [¶]  Go ahead and listen to all these phone calls all over again, if you need to see the context of it; but it is clear when he is talking to Cheyanna Garcia that he is talking about Becca being in the car with him during the murder, because if she knew anything different than the people at the Still Meadow [house], it's because she was there.  [¶] . . . [¶]  If Becca was actually there, which [is] the only reasonable explanation is that she was, then she would be the most logical witness to call, because she would be there to say:  I have first-hand knowledge that boy had a gun.  Derel Smith had a gun and he did what he had to do and I was there and I saw the whole thing.  [¶]  But you never hear from Becca.  And why is that?  Because Becca can't corroborate what the defendant wants you to believe.  Nobody can.  [¶] . . . [¶]  If he actually acted in self-defense, he would have told at least somebody and Becca would be the most logical choice for telling him that.  [¶] . . . [¶]  Randy, we don't hear from.  Randy is allegedly somebody who was pressured by the police and makes it look really bad that . . . he's creating this alibi and that's so taken out of context.  [¶]  Well, where is Randy to come in here and explain how he wasn't scared because he thought he was going to get caught up in a murder and become an accomplice, but he was scared because the detectives were just pressuring him to say things that weren't true.  [¶] . . . [¶]  Where is Monique?  Monique apparently heard this threat from Derel . . . Smith.  Where is she to come in and say:  You know, I knew that Derel was this crazy violent gang member and threatening the defendant.  [¶]  We don't hear from her.  Same thing with Cheyanna.  She was the defendant's girlfriend.  He clearly was confiding with her over the phone over what went on.  To think that he did not ever tell her what happened or that she was unaware of what happened is just ludicrous.  And she's not here to say:  You know, after the murder, he came to me and said he acted in self-defense.  [¶]  She also isn't here to back up any of what the defendant says about what happened that day, about being dropped off at work, and then he comes back later to pick her up or she goes to DJ's house or whatever it was that the story was.  [¶]  Chavanna Lewis is also a logical witness who apparently had her own personal interaction with Derel Smith, where he was allegedly violent with her.  And she's never called to support this allegation that Mr. Smith is so violent.  . . . [¶]  And Peaches, who allegedly had blood running down her

14

to the jury that a defendant has not brought forth evidence to corroborate an essential part of his defensive story." (*People v. Varona* (1983) 143 Cal.App.3d 566, 570; see *People v. Gaines* (1997) 54 Cal.App.4th 821, 825.) The prosecutor may comment on the failure of the defense to call logical witnesses. (*People v. Lewis* (2009) 46 Cal.4th 1255, 1304, citing *People v. Vargas* (1973) 9 Cal.3d 470, 475; see *People v. Johnson* (1992) 3 Cal.4th 1183, 1229.) Here, the prosecutor's comments merely drew attention to the absence of witnesses who might have corroborated the defense. There was no misconduct.

### 4. The Imperfect Self-Defense Argument

Defendant asserts the prosecutor misstated the law as to imperfect self defense. It is prosecutorial misconduct to misstate the applicable law during argument to the jury. (*People v. Huggins* (2006) 38 Cal.4th 175, 253, fn. 21; *People v. Otero* (2012) 210 Cal.App.4th 865, 870.) Again, we find no misconduct.

As our Supreme Court has explained, "A defendant lacks malice and is guilty of voluntary manslaughter in 'limited, explicitly defined circumstances: either when the defendant acts in a "sudden quarrel or heat of passion" (§ 192, subd. (a)), or when the defendant kills in "unreasonable self-defense"—*the unreasonable but good faith belief in having to act in self-defense* [citations]." (*People v. Blakeley* (2000) 23 Cal.4th 82, 87-88, italics added.) "Imperfect self-defense is the killing of another human being under the actual but unreasonable belief that the killer was in imminent danger of death or great bodily injury. [Citation.]" (*People v. Booker* (2011) 51 Cal.4th 141, 182.)[6]

---

face and she was really beaten up and the cops come and talk to her, specifically, and she has no injuries whatsoever. [¶] . . . [¶] . . . So where are all these witnesses? [¶] . . . [¶] . . . So where are all these witnesses to support the defendant's testimony?"

[6] The jury was instructed on imperfect self-defense as it relates to voluntary manslaughter, a lesser included offense: "A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed a person because he acted in imperfect self-defense. [¶] If you conclude the defendant acted in complete self-defense,

15

During her rebuttal closing argument to the jury, Ms. Sadinsky argued: "The imperfect self-defense is an actual belief that [defendant] was in imminent danger of death or great bodily injury and he acted to avoid being killed himself. And an actual belief that he must use deadly force. But one of those actual beliefs on behalf of the defendant was unreasonable." This was a correct statement of the law of imperfect self-defense. (*People v. Breverman, supra,* 19 Cal.4th at pp. 153-154.) Defendant has not challenged that argument.

Defendant takes issue with Ms. Sadinsky's subsequent argument: "[Y]ou have to consider what a reasonable person in the same situation as the defendant would have believed, not [what] the defendant would have believed, not what the defendant would have believed or claims to have believed but what a reasonable person—which Mr. Hatcher clearly is not—what they would have believed." Viewed in context, it is clear Ms. Sadinsky was referring to defendant's self-defense claim, not his imperfect self-defense theory. There was no misstatement of the law of imperfect self-defense.

### D.  Parole Revocation Fine

Defendant asserts the trial court imposed an unauthorized $10,000 parole revocation restitution fine. Both the clerk's minutes and the abstract of judgment reflect imposition of a $10,000 restitution fine (§ 1202.4, subd. (b)) and a $10,000 parole revocation restitution fine (§ 1202.45). The clerk's minutes and the abstract of judgment

---

his action was lawful and you must find him not guilty of any crime. The difference between complete self-defense and imperfect self-defense depends on whether the defendant's belief in the need to use deadly force was reasonable. [¶] The defendant acted in imperfect self-defense if: [¶] 1. The defendant actually believed that he was in imminent danger of being killed or suffering great bodily injury; [¶] AND [¶] 2. The defendant actually believed that the immediate use of deadly force was necessary to defend against the danger; [¶] BUT [¶] 3. At least one of those beliefs was unreasonable." (CALCRIM No. 571; *People v. Breverman* (1998) 19 Cal.4th 142, 153-154.)

16

are in error.  The trial court orally imposed a $10,000 "victim restitution fine to the state fund" under section 1202.4, subdivision (f).  The oral pronouncement of judgment controls over the minutes or the abstract of judgment.  (*People v. Farell* (2002) 28 Cal.4th 381, 384, fn. 2; *People v. Mesa* (1975) 14 Cal.3d 466, 471.)  Upon remittitur issuance, the abstract of judgment must be amended to omit the references to restitution fines under sections 1202.4, subdivision (b), and 1202.45, and to reflect a $10,000 fine under section 1202.4, subdivision (f).

## III.  DISPOSITION

The judgment is affirmed.  Upon remittitur issuance, the clerk of the superior court must amend the abstract of judgment to omit the references to restitution fines under Penal Code sections 1202.4, subdivision (b), and 1202.45, and to reflect a $10,000 fine under Penal Code section 1202.4, subdivision (f), and deliver a copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

O'NEILL, J.[*]

We concur:

TURNER, P.J.

KRIEGLER, J.

_____

[*]     Judge of the Ventura Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

17